In re the MARRIAGE OF GARRISON.

Rebecca E. GARRISON, Petitioner–Respondent,

v.

David L. GARRISON, Respondent–Appellant.

No. 18060.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 4, 1993.

Jerry E. Wells, Joplin, for respondent-appellant.

C.R. Rhoades, Neosho, for petitioner-respondent.

SHRUM, Judge.

In this domestic relations case David L. Garrison (the husband) appeals from a judgment dissolving his marriage to Rebecca E. Garrison (the wife). He challenges the portions of the judgment ordering him to pay child support and dividing marital property and marital debts.

We reverse and remand the portion of the judgment ordering the husband to pay child support of $1,100 a month. In all other respects, we affirm the judgment.

## FACTS

The parties were married September 6, 1975. Two children were born of the marriage: Ellen, born May 18, 1977, and Leigh, born February 29, 1980.

In February 1988, the parties separated and the wife filed a petition for dissolution. She dismissed that case after a bankruptcy court approved a payment to her of $1,000 per month from a family corporation, Pronto Enterprises, a chain of convenience stores and truck stops. Before the separation, she had worked for Pronto as a store manager and trainer of employees.

Pronto had sought bankruptcy protection under Chapter 11 after discovering in August 1987 that it owed the federal government approximately $2,500,000 in unpaid gasoline excise taxes, penalties, and interest. In April 1991, upon petition of the IRS and another creditor, Pronto's Chapter 11 bankruptcy proceeding was converted to a Chapter 7. Thereafter, the wife and the husband received no salary or other payment from Pronto. The wife initiated this dissolution action on April 16, 1991.

After her income from Pronto ceased (and apparently during the summer of 1991), the wife commuted to Pittsburg (Kansas) State University to complete the nine credit hours she needed for her master's degree. As of the January 1992 trial, she had been teaching for the Diamond School District for three and one-half years. Her gross pay from her teaching employment was $1,614.17 per month; her net income was $1,192.07.[1] As noted, the

$1,000 she received from Pronto terminated with the April 1991 payment.

The husband, age 53, was president and managing officer of Pronto. He had been with Pronto 20 years and in the gasoline business for 25 years. Earlier he had held employment in industrial sales, worked for an oil company for two years, and taught school for two years. After Pronto was forced into Chapter 7 bankruptcy, the husband had no employment and no income. He paid his living expenses with personal credit cards and loans from family members and friends. On his Civil Procedure Form No. 14 and his statement of income and expenses, the husband listed his monthly income as "zero." By his testimony, he reaffirmed a lack of income and specifically denied he had monthly income of $6,600, the amount assigned him by the wife on her Form 14.

Concerning his efforts and plans to obtain employment, the husband testified that his earlier hope of employment at one of the business locations formerly owned by Pronto had been dashed because the new owner was "not able to make it." The husband had contacted two prospective purchasers of that business about a job and had discussed a salary "in the neighborhood of $1,800 a month," but he had received no assurance of employment. He stated that $1,800 a month "would be the minimum that I would hope for" and agreed that, given his previous level of income and standard of living, he would "probably not" be satisfied with a job that paid $22,000 a year. Asked "the minimum acceptable level of compensation you're willing to accept for full-time employment," he responded, "I believe in the, I hope, not too distant future, I can get back to the level where I was," that level being "approximately $60,000 a year." He said he planned to seek employment at that level of compensation "[j]ust as soon as I possibly can."

The husband's evidence concerning his past earnings consisted of the following. He denied he ever made $200,000 a year.

---

1. The deductions shown were F.I.C.A., federal and state income tax withholding, teacher retirement deduction, and a $25 monthly annuity payment.

The bankruptcy court approved an annual salary of $40,000 for him when Pronto entered Chapter 11 proceedings. In 1990 his annual salary plus perquisites from Pronto was in the range of $60,000.[2] Deposits into his personal checking account in 1990 exceeded $82,000. He had not filed personal income tax returns for 1988, 1989, and 1990.

The wife's evidence about the husband's income, past and present, came from her Form 14[3] and her testimony. On direct examination, the wife testified:

Q. (to the wife) ... The last few years that you were together, Mr. Garrison was earning how much as a result of the store operation?

A. I don't really know. It would just be an approximate figure.

....

Q. Approximately how much?

A. $200,000.

On her Form 14 the wife listed the husband's monthly gross income at $6,666, which she said was a conservative figure based on what she "knew" the husband's earnings were during the marriage. When asked if she had "anything that supports" the $6,666 monthly income figure, her lawyer responded, "Your Honor, we'll stipulate to that. We don't have any documentation that shows what his income is today."

We will set forth additional facts where necessary in the discussion of the husband's points on appeal.

## THE DECREE

The trial judge awarded marital property valued at $33,073 to the wife and $2,600 to the husband. The husband was ordered to pay all marital debts, which totaled $2,834,-000 and consisted of credit card account balances, a $325,000 contingent debt to Federated Mutual, and the I.R.S. obligation of approximately $2,500,000. The husband was ordered to pay to the wife $1,100 per month for child care costs ($550 per month per child). He was ordered to obtain and maintain health and dental insurance for the two children and to pay all non-covered health expenses for the children, including the deductible under the policy. The court awarded no maintenance, but it ordered the husband to pay the wife $2,500 for her attorney fees. In its decree the trial court declared that the child support order complied with "Schedule 14 of Supreme Court Rule 88.01...."

## APPLICABLE STATUTE AND RULE

Section 452.340, RSMo Supp.1991, governing payment of child support, states in pertinent part:

1. In a proceeding for dissolution of marriage ... the court may order either or both parents owing a duty of support to a child ... to pay an amount reasonable or necessary for his support ... after considering all relevant factors, including:

(1) The financial needs and resources of the child;

(2) The financial resources and needs of the parents;

(3) The standard of living the child would have enjoyed had the marriage not been dissolved;

(4) The physical and emotional condition of the child, and his educational needs.

In 1989, the Missouri General Assembly added subsections 7 and 8 to § 452.340. In subsection 7, the legislature directed the Missouri Supreme Court to adopt a rule establishing guidelines for awards of child support. Subsection 8 of § 452.340 provides, in pertinent part:

Beginning October 13, 1989, there shall be a rebuttable presumption ... that the amount of the [child support] award which would result from the application of the guidelines established pursuant to subsection 7 of this section is the correct amount of child support to be awarded.

2. Perquisites from Pronto included family health and hospitalization insurance, gasoline and gasoline credit cards for family members, a vehicle for the husband, and monthly mortgage payments on a house occupied by family members but owned by Pronto.

3. Neither party placed before the trial judge an income tax return or other written evidence of the husband's income from Pronto or any other source.

In response to the legislative mandate of § 452.340.7, the supreme court adopted Rule 88.01 and Civil Procedure Form 14. Rule 88.01, essentially a restatement of § 452.340.1 and § 452.340.8, provides in part:

When determining the amount of child support to order, a court ... shall consider all relevant factors, including:

(a) the financial resources and needs of the child;

(b) the financial resources and needs of the parents;

(c) the standard of living the child would have enjoyed had the marriage not been dissolved;

(d) the physical and emotional condition of the child; and

(e) the educational needs of the child. There is a rebuttable presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is the amount of child support to be awarded in any judicial ... proceeding for dissolution of marriage, legal separation, or child support. It is sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to Civil Procedure Form No. 14 is correct if the court ... enters in the case a written finding or a specific finding on the record that the amount so calculated, after consideration of all relevant factors, is unjust or inappropriate.

Form 14 includes a worksheet to assist in calculation of a presumed child support amount and a schedule of dollar amounts of child support as determined by the number of children and the parties' combined monthly gross income. The "Directions for Use" accompanying Form 14 include the following:

If either parent is unemployed or underemployed, child support may be calculated in appropriate circumstances based on a determination of potential income. To determine potential income, the court may consider employment potential and probable earnings level based on the parent's recent work history, occupational qualifications, [and] prevailing job opportunities in the community....

### SCOPE OF REVIEW

◼ As in other court-tried cases, our review is governed by Rule 73.01(c) and the principles enunciated in *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976). *Mistler v. Mistler,* 816 S.W.2d 241, 245[1] (Mo. App.1991). Thus we must affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32[1].

### DISCUSSION AND DECISION

#### Child Support

◼ In the husband's first point on appeal he challenges the amount of child support the trial court ordered him to pay. Although not models of clarity, the husband's point relied on and argument track the court's discussion in *Keck v. Keck,* 820 S.W.2d 727 (Mo.App.1991), a case in which the non-custodial parent did "not complain at the amounts arrived at under the guidelines of presumed support, Rule 88.01 and § 452.340, so much as the amount of income ascribed to him and his ability to pay as being an abuse of discretion." *Keck,* 820 S.W.2d at 728.

The husband argues that for the trial court to have complied with the presumed child support guidelines of Rule 88.01, it would have to have imputed to him a monthly gross income of $7,200.[4] Because.

---

**4.** By our Form 14 calculations a monthly income of $7,132 per month must be ascribed to the husband to produce a presumed child support obligation on his part of $1,100 per month.

Gross monthly income
| | |
|---|---|
| Wife: | $1,614 |
| Husband: | $7,132 |
| Total: | $8,746 |

Total monthly child support obligation from Form 14 schedule (two children): $1,349 per month
Wife's share of combined income:
($1,614 ÷ $8,746) = 18.45%
Husband's share of combined income:
($7,132 ÷ $8,746) = 81.55%
Each parent's monthly support obligation:
Wife (0.1845 × $1,349) = $248.89
Husband (0.8155 × $1,349) = $1,100.11

he had no income and did not voluntarily place himself in that position without justifiable explanation, the husband's argument continues, imputation to him of income of nearly $7,200 a month was an abuse of trial court discretion.

Because of the husband's heavy reliance upon *Keck*, we first examine that case. Harold Keck had been an airline pilot all his working life. In March 1989, immediately before he participated in a strike against his employer Eastern Airlines, his take-home pay was $5,800 per month. In April 1989, when the marriage was dissolved, Harold's monthly take-home pay was $5,300. The court ordered Harold to pay child support of $700 per month for a son and $700 per month for a daughter's college expenses.

During the strike, which lasted until 1990, Harold was offered his job back with a 25 percent pay reduction. He refused. When the strike ended, Harold, along with most other striking pilots, was not rehired. It was undisputed that because of his age he would not be hired by any other carrier. He took a job as a co-pilot for a commuter airline at $1,025 per month. If promoted to captain, he could earn $25,000 to $30,000 yearly. His repeated efforts at employment with other airlines were unsuccessful.

In a December 1990 modification order, the trial court left unchanged the $700 child support for the son but reduced Harold's obligation for the daughter to $440 per month. In doing so the trial court imputed to Harold the $30,000 salary which he hoped to have within a year (as a pilot with the commuter airline).

Upon appeal, the Western District of the Court of Appeals concluded the trial court had abused its discretion in attributing a salary of $30,000 to Harold in arriving at the child support amount. The court observed that, unlike the father in *Devries v. Devries*, 804 S.W.2d 825, 827 (Mo.App. 1991), Harold had not voluntarily diminished his income without a justifiable explanation. "The father's diminished income in this case would have reduced the standard of living 'whether or not the marriage had been dissolved'.... It cannot be said the father's situation here is a temporary fluctuation in the parent's fortune." *Keck*, 820 S.W.2d at 729 (quoting *Brandt v. Brandt*, 794 S.W.2d 672, 674 (Mo.App.1990)). Noting that Harold had sought employment from all available sources, the *Keck* court concluded, "The sum accrued by factoring in $30,000 of income to Harold goes beyond his expected ability to pay." 820 S.W.2d at 729.

The wife does not question the *Keck* decision nor does she dispute that the husband was unemployed at the time of trial. Rather, she claims the husband's lack of effort to secure employment distinguishes this case from *Keck*. She points out that in *Keck* the non-custodial parent made extensive efforts to return to his former income level; here, she claims, there were no efforts by the husband to secure employment after the family business failed. She argues that because of the husband's lack of effort in finding employment, the trial court was "entirely justified" in its imputation of income to him and its resulting child support order.

Principles applicable to a determination of a parent's ability to pay child support have been succinctly stated as follows:

In determining the financial condition of the father at the time an award is made, consideration may be given to his past and present earnings and his anticipated future earning capacity. *Mueller v. Jones*, 583 S.W.2d 222, 224 (Mo.App. E.D.1979); *Murray v. Murray*, 538 S.W.2d 587, 589, (Mo.App.E.D.1976); *In re Marriage of Vanet*, 544 S.W.2d 236 (Mo.App.W.D.1976); *Tatham v. Tatham*, 657 S.W.2d 717, 719 (Mo.App.E.D.1983); *Nunn v. Nunn*, 644 S.W.2d 370, 372 (Mo.App.E.D.1982). He may not escape his responsibility by voluntarily declining to work, *Boyer v. Boyer*, 567 S.W.2d 749, 751 (Mo.App.W.D.1978), by deliberately limiting his work to reduce his income, *Butler v. Butler*, 562 S.W.2d 685, 687 (Mo.App.E.D.1977), *Goodwin v. Goodwin*, 746 S.W.2d 124 (Mo.App.S.D.1988), or by otherwise disabling himself financially. *Smith v. Smith*, 558 S.W.2d 785, 789 (Mo.App.E.D.1977). A court may, in proper circumstances, impute an income to a husband according to what he could have earned by the use of his best ef-

forts to gain employment suitable to his capabilities. *Foster v. Foster*, 537 S.W.2d 833, 836 (Mo.App.W.D.1976); *Overstreet v. Overstreet*, 693 S.W.2d 242 (Mo.App.W.D.1985). *See also Morovitz v. Morovitz*, 743 S.W.2d 893 (Mo.App. E.D.1988). Since the 1988 legislation ... these cases can also apply to the income of the noncustodial mother.

*Missouri Family Law*, "Child Support and Maintenance" § 14.7 (MoBar 4th ed. 1988). *See also Wynn v. Wynn*, 738 S.W.2d 915, 919–20 (Mo.App.1987) (court affirmed a child support order even though father not employed; trial court imputed income based on the father's past earnings), and *Weston v. Weston*, 768 S.W.2d 588 (Mo. App.1989) (court affirmed a support order of $1,066 a month even though father's annual income had dropped from $49,000 to a projected $28,000).

■ Despite the ample authority for the proposition that a court may, under certain circumstance, impute income to a party to a dissolution, an award of child support must be supported by evidence of the parent's ability to pay. *Hopkins v. Hopkins*, 664 S.W.2d 273, 273–74[1] (Mo.App.1984). "Regardless of the form of the court's order of child support, there must be evidence in the record to support the order, consistent with Form 14." *Umphenour v. Umphenour*, 831 S.W.2d 764, 767 (Mo.App.1992).

As the wife correctly observes, the record reveals no effort by the husband to obtain employment at his previous income level. Thus it was appropriate for the trial court to impute income to the husband who was not working to his full potential. However, we conclude the evidence of record is insufficient to support a child support award of $1,100 per month.

For a child support award of $1,100 to be consistent with Form 14, the trial court had to impute to the husband an income of $7,132 per month. *See* our calculations, *supra* note 4. Although the record is sparse concerning the amount of the husband's prior income, it is clear that the

family's apparent high standard of living derived chiefly from the husband's income from Pronto Enterprises. Because of the involuntary Chapter 7 bankruptcy, Pronto no longer provides the husband with income. The husband did not voluntarily diminish his income without justifiable explanation. As in *Keck* and *Brandt*, the husband's diminished income would have reduced the family's standard of living had the marriage continued. As we will discuss, the record does not support the conclusion that the husband's situation here is nothing more than a temporary income fluctuation.

The wife offered no evidence that the husband has the capital, the access to capital, or the entrepreneurial abilities to start a new business that would generate income of $7,132 per month. Indeed, that prospect appears improbable considering the apparent legal responsibility of the husband as a managing officer of Pronto to pay a substantial portion of the taxes owed by that firm.[5] Nor did the wife offer any evidence that the husband has management skills, experience, education, or other background that would persuade someone to hire him at a monthly salary of $7,132.

Our independent search of the record reveals no evidence from which it reasonably could be inferred that the husband has a monthly earning potential of $7,132. Indeed, the cause for the failure of Pronto Enterprises—the repeated failure to file tax returns and pay taxes while the husband operated the business—raises a contrary inference. Cast in the best light, the husband, despite 20 years' experience in the gasoline business, either lacked sufficient business acumen to realize that excise taxes had not been paid for three years or was so inattentive to his business that he permitted the taxes to go unpaid. Cast in the worst light, as the managing officer of Pronto, the husband intentionally and repeatedly failed to file required tax returns for the firm. Whatever the reason, Pronto's tax returns were not filed and the taxes were not paid.[6] Where a trial court

**5.** It appears from the record that the wife also faces personal responsibility for sizeable tax liens attributable to the tax delinquencies of Pronto Enterprises.

**6.** The husband testified that additional tax liens existed because, although he and the wife filed personal income tax returns for 1985, 1986, and 1987, they did not pay taxes for those years.

imputes income to a parent, the amount must be within that parent's capacity to earn. *Keck*, 820 S.W.2d at 729[2]. Upon this record there is insufficient evidence to impute to the husband an income of $7,132 per month.

We are not unmindful of the unsatisfactory record confronting the trial judge as he sought to arrive at a child support figure. However, based upon this record, we find an abuse of discretion in setting the child support amount. We reverse and remand for additional proceedings on that issue.[7]

### Division of Property and Debt

■ In Point II the husband challenges the trial court's division of marital property and debt. Disparity in the value of marital property awarded each spouse is justified if the relevant factors, statutory or otherwise, justify an unequal division. *Mistler*, 816 S.W.2d at 252[10]. Upon consideration of the policies embodied in the dissolution law regarding division of marital property, including the nature of the property awarded, and considering the circumstances of this case,[8] we find no abuse of trial court discretion in its division of the marital property and debt. The judgment concerning the division of marital property and debt is supported by substantial evidence, and no error of law appears. An opinion would have no precedential value. We affirm the marital property and debt division pursuant to Rule 84.16(b)(1) and (5).

The husband did not file personal income tax returns and did not pay personal income taxes for 1988, 1989, and 1990.

7. Our decision affects *only* the portion of the judgment ordering the husband to pay $1,100 a month in child support. The husband makes no complaint about the portions of the order that require that he obtain and maintain health and dental insurance for the children and that he pay their non-covered health expenses, including the deductible under the insurance policies. Because he has not complained, the husband has waived any challenge to that portion of the trial court's order, and it is unaffected by our decision.

8. In addition to the multitude of problems faced by the parties because of their various tax delinquencies, the following is pertinent. The house originally used by the parties as their marital home was located on 160–200 acres (the "valley

The portion of the judgment ordering the husband to pay $1,100 a month child support is reversed and the cause remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

CROW, P.J., and MONTGOMERY, J. concur.

PARRISH, C.J., recused.

farm"). Valued by the husband at $150,00–$200,000 (appraised value) and possibly $350,000 (on the "high side"), the valley farm had been transferred to Pronto before its demise. By transactions not clearly revealed by the record, the valley farm plus acreage described as the McDonald County farm were transferred from Pronto to the husband's brother. Transfer of the valley farm was described as being pursuant to a foreclosure, whereas the McDonald County acreage was transferred to satisfy an old debt. At the time of trial the trustee in bankruptcy was vigorously seeking to set aside those transfers. Throughout, the husband has continued to live on the valley farm. Additionally, there was evidence of transfers of vehicles and other personal property by the husband to family members and acquaintances for questionable consideration.