**In re the Marriage of Susan D. BUCHHOLZ, Petitioner–Respondent,**

v.

**Scot A. BUCHHOLZ, Respondent–Appellant.**

**No. 26034.**

Missouri Court of Appeals, Southern District, En Banc.

July 7, 2005.

James R. Sharp, Sharp & Bredesen, Springfield, for appellant.

Mark J. Millsap and J. Matthew Miller, Baird, Lightner, Millsap & Kollar, P.C., Springfield, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

Scot A. Buchholz ("Husband") appeals a decree dissolving his marriage to Susan D. Buchholz ("Wife"), contending that the trial court erred in awarding Wife maintenance; in imputing income to him for the purposes of calculating child support and in determining the amount he should pay as maintenance; in requiring him to pay 85% of the children's medical expenses not covered by insurance; and in entering a judgment against him for back child support, attorneys fees "and other items." We affirm in part and reverse in part and remand.

Husband and Wife, who were married in May, 1981, had four children whose ages at the time of the judgment in this case ranged from twelve to twenty-two. Wife, who had less than a year of college, held various jobs during the marriage including that of retail salesperson at J.C. Penney's,

working for a business that maintained plants for commercial businesses, and working at a local hospital.

At the time of their marriage, Husband, who had two years of college, was employed as a salesperson by Colony Magnavox ("Colony"), a retail store selling televisions and other video and audio equipment. He progressed in that employment to becoming the operations general manager/assistant to the owner earning over $80,000. In February 1991, Husband and Wife purchased Colony under an agreement whereby the owner would finance the purchase over a period of five years.

Husband and Wife separated in September 1993 after twelve years of marriage. According to Husband the separation occurred because they "fell out of love" and their relationship deteriorated. Wife believed that the reason Husband moved out of the home was because he was involved with someone else. He later admitted that he had become romantically involved with Sue Rink, an employee of Colony. Wife did not file the petition to dissolve the marriage until May 2000 because Husband convinced Wife that a divorce would jeopardize the completion of the purchase of Colony as a provision in the contract gave the prior owner the option to call the loan at any time if he felt that his interests were in jeopardy. Husband did, however, make the house payments, paid health insurance on the children through the business, and paid Wife $2,000 per month.

Colony experienced financial difficulties. The evidence is conflicting about the reasons for those difficulties. For instance there was a suggestion that increased competition from discount retailers contributed to it. Wife presented evidence indicating that Husband mismanaged the business or squandered the profits. In any event, the physical location of the business was moved to a different building that required expenditures for improvements ("infill"). Husband negotiated with Village Bank to move his lines of credit loans there and to pay off loans at Firstar Bank. Those loans would have provided $115,000 for the infill needed at the new business location as well as new computer equipment. Village Bank, however, required a deed of trust on the marital home.

In the spring of 2000, Husband told Wife that she needed to sign documents in order for Village Bank to provide financing to the corporation. The documents she was asked to sign would have apparently included a deed of trust on the marital home, and Wife refused to sign them. She filed her petition for dissolution of marriage shortly thereafter, and Husband discontinued the monthly payments to her that he had been making previously.

Pursuant to an agreement between the parties, the trial court entered a temporary order on June 20, 2001, requiring Husband to pay the monthly mortgage payment of $1,142 on the family home, college tuition for a child that was then in college, the premium on a life insurance policy that named the children as beneficiaries, the premium on an auto insurance policy for the child that was in college, monthly dues to a "Family Center," and $2,100 per month in child support. Colony closed when Husband filed bankruptcy in March 2002, both personally and for the corporation, and he defaulted on the payments provided in the temporary order from February 2002 until at least December 2002.

Husband moved, with Sue Rink, to Kentucky in July 2002. Although Husband had earned between $118,200 and $180,550

in the years leading up to the bankruptcy,[1] he was without work until obtaining a job with an appliance retailer in Cincinnati, Ohio, in October 2002 earning $36,000 per year. In the intervening months he had sent at least thirty resumes to prospective employers, had been interviewed by a number of them, and accepted the only job offer he received.

The dissolution was heard in December 2002. The judgment entered by the trial court adopted findings recommended by the Family Court Commissioner. They included the following:

8. [Wife] is currently employed at two jobs in order to provide financially for herself and the children. The second job became necessary when [Husband] was no longer providing health insurance for the children. [Wife] works approximately 54–60 hours per week, consisting of full-time employment with Touch of Greenery (earning $12.00 per hour) and part-time employment with Cox Health Systems (earning $7.40 per hour). She has a total gross monthly income from her joint employments of $1,945 and a net monthly income form [sic] her employments of $1,572.

9. [Husband] currently resides near the Cincinnati, Ohio[,] area with his girlfriend, Sue Rink ... [and] is currently employed as a sales associate with H[.]H[.] Gregg Appliance and Electronics. The evidence at trial indicated that [Husband] was, in the immediate past, employed as the owner/President and General Manager of Colony Magnavox/Colony Home Entertainment ("Colony") at the Battlefield Road location. The

evidence was that on or about March 6, 2002, [Husband] filed his personal (Chapter 7) bankruptcy Petition.... The evidence was that [Husband] has over 23 years of retail management and sales experience, with the last 19 years managing and operating the Colony business.

10. [Husband] testified that his financial demise and ultimate bankruptcy was brought about largely as a result of [Wife's] refusal to cooperate with respect to refinancing needed to keep the Colony business afloat. The Court finds [Husband's] testimony in this regard to be totally lacking in credibility. The Court finds the overwhelming evidence suggests that [Husband] repeatedly failed to provide requested financial records and information to lenders despite numerous requests from those lenders and creditors. In fact, the Court notes that Sue Rink, [Husband's] current live-in girlfriend (and former sales manager at Colony), is the one person who has apparently flourished financially in the aftermath of [Husband's] bankruptcy.

11. [T]he Court finds that [Husband] has the earning capacity to obtain management level type employment and to earn substantially more than the pay he receives at his current place of employment. Therefore, the Court imputes to [Husband] a gross monthly income of $12,083 (or a $145,000 annual income) based on his average annual income with Colony over the past three years. The

---

1. According to the evidence, Husband's gross earnings from the corporation for the following fiscal years (July 1 to June 30) were: $168,200—1995; $180,550—1996; $173,200—1997; $118,200—1998; $155,850—1999; $148,200—2000; and $161,800—2001.

Court finds that [Husband] is currently underemployed and is capable of earning at the level of income imputed herein if he in fact makes a good faith effort to maximize his income earning potential, which should not necessarily be limited to the Cincinnati, Ohio[,] area where he lives and resides with Sue Rink.

12. In accordance with the evidence presented, the Court finds that [Wife] lacks sufficient property, including property apportioned to her, to provide for her needs, and that after considering all relevant factors including those set out in Section 452.335 RSMo., [Husband] should pay [Wife] periodic maintenance as set forth in the Judgment. The court concludes that the [Wife's] reasonable monthly expenses total $5,680, as per [Wife's] Exhibit "2." The Court further finds that given the history of the parties and their economic status, the [Wife] has been the homemaker and primary caretaker of the children and has a net or disposable monthly income from her jobs totaling $1,572, from which to meet her reasonable needs. In contrast thereto, the Court finds that [Husband] has worked in an owner/management position in retail sales for a number of years and has generated annual incomes and salaries in excess of $180,000. The Court finds that [Husband's] average annual income over the past three (3) years totals $145,000. The Court finds that [Husband] is capable of earning $145,000 annually, based upon his education,

training and employment history. Accordingly, the Court concludes that an appropriate income to be attributed to the [Husband] is $145,000 per year, or $12,083 per month.

13. The Court determines that [Husband] has net income producing ability to help meet [Wife's] reasonable needs, while at the same time meeting his own monthly expenses. The Court finds that [Husband's] net monthly income (based upon the $145,000 annual figure) is sufficient to meet his needs and pay the Court ordered child support and maintenance with consideration given to the fact that [Husband's] monthly expenses are shared with Sue Rink, with whom he now lives. The Court has considered conduct of the parties in making this determination and the Court specifically notes that [Husband] has either squandered, depleted or otherwise dissipated much of the parties' marital estate. The Court finds [Husband's] testimony as to his efforts to obtain alternative employment at an income commensurate with his job skills and experience is lacking credibility. Based upon [Husband's] average $145,000 annual income, and applying a 28% federal and state income tax liability, [Husband] has a net or disposable monthly income of $8,700 ($145,000–$40,600 (28% tax liability) = $104,440 (net annual income) ÷ 12 (months) = $8,700 net monthly income). After deducting a monthly child support obligation of $2,402,[2] the

2. The court's judgment actually required Husband to pay child support of $2,224 per

Court finds that [Husband] is able to pay $1,930 per month as periodic maintenance to [Wife] thus leaving [Husband] the sum of $4,368 with which to contributed [sic] towards the shared living expenses of [Husband] and Sue Rink.

. . . .

19. The Court rejects the Form 14 Child Support Calculation Worksheets proposed by both parties for the reason that the[y] differ in one or more respects from the figures deemed most appropriate by the Court based upon the evidence adduced at trial. The Court finds that the presumed correct child support amount as calculated by the Court as per the attached Court Exhibit A, pursuant to § 452.340.8 RSMo.1994, Supreme Court Rules 88.01 and Civil Procedure Form 14 is $2,224 per month for four children; the Court further finds that the presumed correct child support amount pursuant to said statute and rule is $2,033 for three children (Court Exhibit B), $1,762 for two children (Court Exhibit C), and $1,287 for one child (Court Exhibit D). The Court further finds, after consideration of all relevant factors pursuant to said statute and rule, that said presumed amounts are not rebutted as unjust or inappropriate. Accordingly, the Court finds that [Husband] shall pay to [Wife] the monthly sum of $2,224 as and for support of the parties four minor, unemancipated children. . . .

month.

The court also ordered Husband to maintain medical insurance on the minor children at his cost of $69 per month, and directed that the uninsured medical, dental, optical, orthodontic and prescription expenses of the children, including any copayments, would be paid 15% by Wife and 85% by Husband. In addition, the Court found that Husband failed to pay Wife a previously ordered sum of $35,745 representing back child support, attorney fees and other items and entered judgment against him in that amount. This appeal followed.

■ .The standard of review in a dissolution case is governed by the principles described in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).[3] The judgment will be sustained unless it lacks substantial evidentiary support, is against the weight of the evidence, or erroneously declares or applies the law. *Booher v. Booher*, 125 S.W.3d 354, 356 (Mo.App. E.D. 2004). Under this standard, considerable deference is accorded judgments turning on evidentiary and factual evaluations by the trial court, but no such deference is accorded, however, when the law has been erroneously declared or applied. *In re Marriage of Carter*, 4 S.W.3d 562, 564 (Mo.App. S.D.1999).

■ In his first point on appeal, Husband contends that the trial court erred in awarding Wife child support of $2,224 per month because it was based on an income imputed to him of $145,000 per year. We agree.

■ The theory behind imputing income to a spouse/parent is directed toward preventing a spouse from escaping responsibilities to the family by deliberately or voluntarily reducing his or her income.

**3.** *Murphy* interpreted the provisions of former Rule 73.01(c) which now appears in essentially the same form as Rule 84.13(d).

*See In re Marriage of Graham,* 87 S.W.3d 898, 900 (Mo.App. E.D.2002); *Honderick v. Honderick,* 984 S.W.2d 205, 212 (Mo. App. W.D.1999); *State ex rel. Atkinson v. Anthony,* 947 S.W.2d 832, 834–35 (Mo.App. W.D.1997); *Quackenbush v. Hoyt,* 940 S.W.2d 938, 943 (Mo.App. S.D.1997); *Hansen v. Phenicie,* 917 S.W.2d 618, 619 (Mo. App. E.D.1996); *In re Marriage of Braun,* 887 S.W.2d 776, 779 (Mo.App. E.D.1994); *Jensen v. Jensen,* 877 S.W.2d 131, 136 (Mo.App. E.D.1994). "In order to avoid such a situation, a court may, *in proper circumstances,* impute an income to a spouse according to what that spouse could earn by use of his or her best efforts to gain employment suitable to that spouse's capabilities." *Jensen,* 877 S.W.2d at 136 (emphasis in original). What constitutes "proper circumstances" depends on the facts and must be determined on a case-by-case basis, but includes a situation where a parent has voluntarily reduced his income without justification. *Perkins v. Perkins,* 21 S.W.3d 184, 186 (Mo.App. S.D. 2000). Also included are situations where a parent involuntarily lost a job but, (1) failed to use his or her best efforts to obtain a new job, (2) refused to accept employment offers, or (3) failed to show that the unemployment was other than temporary. *Walker v. Walker,* 936 S.W.2d 244, 247–48 (Mo.App. S.D.1996). Courts do not, however, interfere within the marital relationship to compel spouses to obtain employment which will generate the maximum possible income to support their children, or to mandate the employment which a spouse is required to take. *Smith v. Smith,* 969 S.W.2d 856, 859 (Mo.App. E.D. 1998).

The imputation of income to one who is underemployed is, for purposes of child support, to be in the context of a Form 14 calculation. *See Monnig v. Monnig,* 53 S.W.3d 241, 245 (Mo.App. W.D.2001).

Comment H to Form 14, relating to line one (gross income) calculations states:

H. COMMENT: **Imputed Income:** When determining whether to include imputed income and, if so, the amount to include in a parent's "gross income," a court or administrative agency shall consider all relevant factors, including:

(1) The parent's probable earnings based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding and during any other relevant time periods;

(2) The parent's occupational qualifications;

(3) The parent's employment potential;

(4) The available job opportunities in the community; and

(5) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home.

Husband's "probable" earnings based on an earnings history, employment potential, and "available" job opportunities in the "community" are of particular significance here.

 A parent must have the capacity to earn income which is imputed to him or her, and an award of child support must be supported by evidence of the parent's ability to pay. *Walker,* 936 S.W.2d at 248. The record in this case does not support the conclusion that Husband's "probable" earnings are in the range of $145,000. Granted, Husband previously made that much income from Colony before it failed and ended in bankruptcy. Proof, however, that a parent has previously made more money is not alone a sufficient basis upon which to impute income at those levels. *Perkins,* 21 S.W.3d at 186; *Walker,* 936 S.W.2d at 248.

In support of its imputation of income to Husband, the trial court found that he had over twenty-three years of retail management and sales experience; had an average annual income over the prior three years of $145,000; "has the earning capacity to obtain management level type employment and to earn substantially more than the pay he receives at his current place of employment"; that the financial demise and ultimate bankruptcy of Husband and the business was because he failed to provide requested financial records and information to lenders; and that he "is currently underemployed and is capable of earning at the level of income imputed herein if he in fact makes a good faith effort to maximize his income earning potential, which should not necessarily be limited to the Cincinnati, Ohio area." There was no evidence, however, that Husband had made less than a good faith effort to obtain employment. He moved to Independence, Kentucky, and sent at least thirty resumes to prospective employers in the general area in addition to contacting others. As a result of his contacts, he had at least twenty-two interviews and received but one job offer from H.H. Gregg Appliances and Electronics in Cincinnati, Ohio, which he accepted. He had worked there since October 2002 earning $36,000 annually. According to the evidence, many of the businesses with whom he applied were looking for someone with a college degree, whereas he has only two years of college.

The trial court noted that Husband's efforts to find better employment should not necessarily be restricted to the area where he lives. There was no evidence that Husband would have had more success finding a better paying job in another geographical location. Additionally, we are not aware of any authority that would support an imputation of income because a spouse failed to seek employment in a particular community or geographical area. In fact, Comment H to Rule 14 refers to "available job opportunities in the community." Granted, it does not identify which "community" is referred to, but in *In re Marriage of Lowe,* 860 S.W.2d 813, 818 (Mo.App. S.D.1993), this court indicated that the relevant "community" is where the spouse is living at the time. There, income was imputed by the trial court to the wife who had since moved with her husband to Minnesota. *Id.* This court reversed the child support award, noting that there was no evidence that work similar to that which she held in Missouri was "available within a reasonable distance of her new home." *Id.*

The trial court found that Husband's testimony about his "efforts to obtain alternative employment at an income commensurate with his job skills and experience is lacking credibility." Mother, however, presented no evidence that Husband had failed to make good faith efforts to find better employment, that such employment was available, or evidence that would support the imputation of $145,000 per year income to Husband.

In *Hansen,* 917 S.W.2d at 619, the trial court imputed an annual income of $20,000 to a mother who had lost her employment, but who offered evidence of her efforts to obtain other employment. The appellate court reversed the decision to impute income to her saying that the father had offered no evidence to support a finding that the mother had not attempted to find employment nor evidence of available employment. *Id.* The court held that contrary to the trial court's judgment, "evidence presented would only support a finding of Mother's substantial effort to seek employment." *Id.* Also, in *Silverstein v. Silverstein,* 943 S.W.2d 300, 302 (Mo.App. E.D.1997), the appellate court reversed a dissolution decree imputing in-

come to the mother whose job had been terminated and who had sought, but had not found, other employment. In doing so, the court noted that the mother had testified that she had sought employment by contacting headhunters, sending out resumes, and making phone calls. *Id.* The court concluded that "[f]ather offered no evidence to the contrary," and that "[o]ur review indicates that the trial court's imputation of $48,000[ ] annual salary to mother is not supported by substantial evidence." *Id.; see also Walker,* 936 S.W.2d at 248 (wife failed to produce substantial evidence that husband had other qualifications for available occupations or to support the amount of income imputed to him); *Baker v. Baker,* 60 S.W.3d 19, 24 (Mo.App. E.D.2001) (the amount of income imputed to a parent must be supported by substantial evidence).

The facts in *In re Marriage of Garrison,* 846 S.W.2d 771 (Mo.App. S.D.1993), are similar, in important respects, to the instant case. There, the husband had previously earned at least $60,000 per year plus numerous fringe benefits in his capacity as president and managing officer of a family-owned convenience store business. *Id.* at 772–73. The business took bankruptcy when it developed that it owed the federal government approximately $2,500,000 in unpaid gasoline taxes, penalties and interest. *Id.* at 772. At the time of trial, the husband was still not employed, and testified about rather minimal efforts he had made to obtain a job paying at least $22,000 per year. *Id.* He said that he hoped he could, in the not too distant future, obtain employment of approximately $60,000 per year. *Id.* The trial court imputed income to the husband of $7,132 per month, but this court reversed. *Id.* at 777. We held that the husband had not voluntarily diminished his income without justifiable explanation even though the failure and bankruptcy of the business had resulted from his failure to file tax returns and pay taxes while operating that business. *Id.* We also noted that the loss of income would have reduced the family's standard of living had the marriage continued, and that there was a lack of evidence from which it could reasonably be inferred that the husband had as much monthly earning potential as that imputed to him. *Id.* at 776. In that regard, we noted that the wife offered no evidence that the husband had the capital, access to capital, or the entrepreneurial abilities to start a new business that would generate the amount of income imputed to him. *Id.* at 776. These same considerations apply in the instant case.

Another consideration noted by this court in *Garrison* was that there was no evidence that the husband had the management skills, experience, education, or other background that would persuade someone to hire him at the income levels imputed to him. *Id.* Here, although Colony was profitable for several years while it was being run by Husband, the fact is that bankruptcy resulted, and there was no evidence that his managerial history would persuade anyone to hire him at his previous income levels. The trial court also believed that the failure of the business resulted from Husband's failure to provide requested financial records and information to lenders and that he had squandered, depleted or otherwise dissipated much of the marital estate. In *Garrison,* we held that even if the failure of the business resulted from the husband's intentional failure to pay taxes, imputation of income at his former earnings level would not be supported by the record. *Id.* at 776–77.

Finally, in *Garrison* we also held that because the record revealed no effort by the husband to obtain employment at his previous income level, it was appropriate

to impute some income to him. *Id.* at 776. Unlike *Garrison,* however, in the instant case, Husband took the only job offer he received after substantial effort to become employed in the field in which he had experience.

The decision of the western district of this court in *Keck v. Keck,* 820 S.W.2d 727 (Mo.App. W.D.1991), is also instructive. There, the husband was a pilot for Eastern Airlines earning a net of $5,800 per month when the machinists went on strike. *Id.* During the strike, husband was offered his job back at a twenty-five percent reduction, but refused and was not rehired when the strike ended. *Id.* He obtained employment with a commuter airline earning $1,025 per month, and indicated that if promoted to captain, a promotion he hoped would take place within a year, he could earn $25,000 to $30,000 annually. *Id.* at 728. The trial court imputed income to him in the amount of $30,000 per year. *Id.* In reversing, the appellate court held that the husband had not voluntarily placed himself in a position of diminishing his income without justifiable explanation, and that his diminished income would have reduced the standard of living whether or not the marriage was dissolved. *Id.* at 729. It also held that income imputed to a parent must be within that person's capacity to earn, and in that case, the amount imputed to the husband went beyond his expected ability to pay. *Id.*

As in *Garrison* and *Keck,* the income and standard of living in the Buchholz family would have diminished whether the marriage had dissolved or not. The trial court did not find, and we see nothing in the record to indicate, that Husband's diminished income was the result of a deliberate or voluntary attempt to avoid his support obligations to his family. "[I]t is axiomatic that there must be evidence to support a finding that the parent is deliberately limiting his or her work to reduce income before it is appropriate to impute income." *Davis v. Dep't of Soc. Serv.,* 21 S.W.3d 140, 141 (Mo.App. W.D.2000). "Courts should not impute income where the record does not establish an attempt to evade parental responsibilities." *Smith,* 969 S.W.2d at 859.

We do not condone any misconduct by Husband which may have contributed to the financial difficulties, but we believe that the conclusions of the trial court regarding imputation of income were not supported by the evidence and were misapplications of the law. Accordingly, we reverse the judgment for child support and remand the case to the trial court for further proceedings on that issue. *See In re Marriage of Graham,* 87 S.W.3d at 901; *Smith,* 969 S.W.2d at 859.

■ In another of Husband's points on appeal, he contends that the trial court erred in awarding maintenance in any amount to Wife. He argues that it was erroneous for the trial court to conclude that Wife could not support herself, the award was not based on substantial evidence, and the award constituted a misapplication of the law.

The trial court found that Wife's reasonable monthly expenses totaled $5,680; that she had a net monthly income of $1,572; that she lacked sufficient property, including property apportioned to her, to provide for her own needs; that by imputing income of $12,083 per month (1/12 of $145,000 per year) to Husband, he had the ability to "help meet [Wife's] reasonable needs, while at the same time meeting his own monthly expenses"; that after considering all relevant factors including those set out in § 452.335 RSMo.,[4] Husband

**4.** All references to statutes are to RSMo (2000) unless otherwise indicated.

should pay periodic maintenance; and it ordered him to pay maintenance of $1,930 per month.

█ In determining whether a spouse is entitled to maintenance in any amount, § 452.335.1 provides, in pertinent part, that it may be granted only if the court finds that a spouse seeking maintenance lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and is unable to support himself through appropriate employment. Thus, to proceed under the statute, the court must first determine the reasonable needs of the spouse seeking maintenance, and then determine whether that spouse is able to provide for those needs through the use of property or appropriate employment. *McIntosh v. McIntosh*, 41 S.W.3d 60, 67–68 (Mo.App. W.D.2001).

In support of his contention that Wife did not demonstrate a need for maintenance, Husband argues that her expenses were inflated by using expenses incurred strictly for the needs of the children, and that without those expenses, her monthly income was sufficient to meet her needs.

In arriving at average monthly expenses of $5,684.09, Wife's income and expense statement included the usual expenses for rent, utilities, automobile, insurance, food, clothing, medical care, recreation, laundry and cleaning, beauty shop, and church which totaled $2,360.71. In addition, however, the expense statement also itemized expenses specifically relegated to the children in the amount of $3,323.38. The items specifically shown as being for the children included the following:

| | |
|---|---|
| Groceries | $ 700.00 |
| Eating Out | $ 100.00 |
| Clothing | $ 756.21 |
| Medical Care | $ 51.00 |
| Prescription Drugs | $ 15.00 |
| Dental Care | $ 13.00 |
| Recreation | $ 180.00 |
| Laundry & Cleaning | $ 80.00 |
| Barber & Beauty | $ 95.26 |
| Church & Charitable Contributions | $ 10.00 |
| Camps & Lessons | $ 330.00 |
| Books & School Supplies | $ 100.00 |
| Lunches | $ 90.00 |
| Animals | $ 50.00 |
| Gas & Oil for children's autos | $ 306.25 |
| Maintenance for children's autos | $ 186.66 |
| Auto insurance for children | $ 260.00 |
| | $3,323.38 |

The Form 14 prepared by the Family Court Commissioner in support of the child support award, which was adopted by the trial court, also gave Wife credit for $219 in health insurance costs for the children. The list of expenses utilized by the trial court in establishing Wife's need for maintenance also included $239 for health insurance. Wife's testimony indicated that the $219 figure was the cost of health insurance for the children at the time of trial, and it was going up to $239 the next month. It therefore appears that the same expense was used to increase both Husband's child support obligation as well as his obligation for maintenance.

Form 14 makes provision for the inclusion of "Additional Child–Rearing Costs" in lines 6a through 6e. Included are "[o]ther extraordinary child rearing costs." The Direction concerning line 6e directs the preparer to "[e]nter the monthly amount of any other extraordinary child-rearing costs paid or to be paid by the parent by agreement or pursuant to court order for the children who are the subject of this proceeding." It appears, therefore, that the itemized expenses specifically related to the children contained in Wife's income and expense statement, and utilized by the trial court in awarding maintenance, should have been included, if found to be appropriate, in the child support calculation rather than in calculating maintenance.

In *Adams v. Adams*, 108 S.W.3d 821, 827–28 (Mo.App. W.D.2003), the husband made the same complaint, i.e. that the trial

court improperly included a child's needs in arriving at its determination that the wife was in need of maintenance. The appellate court agreed, and said, in reversing the maintenance award, "[t]he child's needs should not be included in the maintenance calculation." *Id.* at 827. As explained in *Nichols v. Nichols,* 14 S.W.3d 630, 637 (Mo.App. E.D.2000), maintenance is for the needs of the recipient spouse, not for child support; maintenance payments must be limited to the needs of the party requesting support; the authority of the court to order support is dictated and limited by applicable statutes; and § 452.335 governing spousal maintenance does not provide for amounts expended for the direct care and support of dependent children. *See also Cohen v. Cohen,* 73 S.W.3d 39, 51 (Mo.App. W.D.2002).

Of the $5,680 found by the trial court to be Wife's reasonable monthly expenses, it appears that $3,562.38[5] was attributable solely to the children and was improperly considered in determining the need and amount of maintenance. Without considering those, Wife's monthly expenses would be $2,121.71, or $549.71 more than her net monthly income of $1,572.[6]

■ Based on the above, we cannot conclude that the trial court erred in finding that Wife's reasonable needs exceeded her ability to provide for them through reasonable employment. The trial court, however, erroneously included expenses solely attributable to the children in determining the amount of Wife's reasonable needs for maintenance.

5. $3,323.38 from Mother's income and expense statement plus $239 for health insurance for the children claimed by Wife on the same statement equals $3,562.38.

6. The trial court found that although Wife was holding two separate jobs and working 54–60 hours per week, her physical health

■ Additionally, one of the relevant factors to be considered in setting the amount of maintenance is the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. Section 452.335.2(8). "In determining the amount of maintenance, the trial court must consider both the reasonable needs of the spouse seeking maintenance and the other spouse's ability to pay, and '[a]n award of maintenance should not exceed the paying spouse's capacity to provide.'" *Thomas v. Thomas,* 76 S.W.3d 295, 302 (Mo.App. W.D.2002) (quoting *Griffin v. Griffin,* 986 S.W.2d 534, 538 (Mo.App. W.D.1999)). Here, the trial court also utilized the imputed income of $145,000 per year in assessing Husband's ability to pay the maintenance award of $1,930.

■ The calculation of maintenance and child support should reflect similar factual determinations with regard to imputed income, absent some evidentiary or legal basis for treating the two calculations differently. *Evans v. Evans,* 45 S.W.3d 523, 531 (Mo.App. W.D.2001). Accordingly, appellate courts often look to Form 14 calculations in assessing the reasonableness of findings regarding maintenance. *Id.* As indicated earlier in the discussion relating to the calculation of child support, we concluded that an annual income of $145,000 was erroneously imputed to Husband. The same is true with reference to the maintenance award. It also must be reversed and remanded to the trial court for further proceedings.

was compromised by reason of her severe anemia, borderline hyper-thyroid disorder and Raynaud's disease. It did not find that her income was diminished because of that, and we are cited to nothing in the record in support of that finding.

■ In another point relied on, Husband claims error in the portion of the judgment requiring him to pay 85% of the uninsured medical, dental, optical, orthodontic and prescription expenses for the children. While he cites *In re Marriage of Gerhard,* 985 S.W.2d 927, 932, n. 4 (Mo. App. S.D.1999), for the proposition that the payment of uninsured medical expenses is the equivalent of an order for the payment of child support, his argument focuses on the disparity between the percentage his actual income bears to the total incomes of he and Wife (60.7%) versus the 85% of uninsured expenses he was ordered to pay. He argues that Wife is capable of paying more than 15% of those expenses and that he is not capable of paying the 85% he was ordered to pay. He concludes that, based on *Barrett v. Barrett,* 963 S.W.2d 454, 457–58 (Mo.App. E.D.1998), we should reverse this portion of the judgment and conclude that he should only pay 60.7% of the uncovered medical expenses.

Husband's contention in this point is not well taken for several reasons. First, *Barrett* did not hold that a spouse must be required to pay the same percentage of uninsured medical expenses of children that his/her income bears to the total combined income of the two spouses. There, the trial court made its own Form 14 calculations in which it determined that the wife would participate by 22% and the husband would participate by 78% of the total child support amount. 963 S.W.2d at 458. The court also found that the presumed correct child support amount demonstrated in that Form 14 calculation was unjust or inappropriate and ordered the husband to pay child support in an amount equaling the total of the monthly expenses for the children in addition to paying 90%

of the uninsured medical expenses. *Id.* at 457. In reversing, the appellate court held that a determination that one spouse can afford to pay all of the presumed correct child support amount does not relieve the other spouse of paying their share. *Id.* It was concluded that the court's orders must be reversed because of the lack of substantial evidence to support the child support award, and the apparent ambiguities or inconsistencies in its findings. *Id.* at 459.

We also note that the Directions, Comments For Use And Examples For Completion of Form No. 14 contain the following Caveat with reference to "Line 6d: Uninsured extraordinary medical costs" that became effective October 1, 1998:[7]

*A finding by the court or administrative agency that the presumed child support amount is unjust or inappropriate is not necessary where the parent obligated to pay support is also ordered to pay **any** percentage of the uninsured extraordinary medical or dental expenses of the children who are the subject of the proceeding.*

This does not necessarily lead to the conclusion that a parent's share of the uninsured medical expenses from children must be the same percentage as determined in the child support calculations. Accordingly, this point is denied.

■ In his final point on appeal, Husband contends that a judgment entered against him by the trial court in the amount of $35,745 for back child support, attorneys fees and "other" items was erroneous as not being based on substantial evidence and constituted an abuse of discretion. He argues that the judgment was based on temporary support orders entered at a time when he was earning a

---

7. *Barrett* was decided February 17, 1998. *See also Short v. Short,* 947 S.W.2d 67 (Mo.App. S.D.1997) decided April 8, 1997.

substantial income from the business; he had filed motions to modify the temporary awards that were taken with the case; when the judgment was entered he had taken bankruptcy and was not earning income; and he is not capable of paying the amount of the judgment because he was earning only $36,000 per year.

The record indicates that in June 2001, the trial court, by agreement of the parties, ordered Husband to pay the monthly mortgage payments on the family home of $1,142; the college tuition of one of the children; premiums on a life insurance policy; premiums for insurance on a car driven by one of the children; monthly dues to a "Family Center"; and $2,100 in monthly child support. Husband does not contest the authority of the trial court to order the payment of these amounts, but contests the award of sums in the final judgment based on the temporary orders when, he says, it was clear that he had no way of satisfying them. He also argues that all but $8,000 of the $35,745 judgment was for sums due after he and the business took bankruptcy.

 Husband cites no authority in support of his contention under this point other than authority for the general standard of review. It is an appellant's obligation to cite appropriate and available precedent, and if none is available, an explanation should be made for its absence. *Champion v. J.B. Hunt Transport, Inc.*, 6 S.W.3d 924, 931 (Mo.App. S.D.1999). The failure to cite relevant authority or explain its absence justifies a conclusion that the point is abandoned. *Id.* Accordingly, this point is considered abandoned.

We reverse the portion of the decree awarding child support and maintenance and remand the case to the trial court for further proceedings consistent with this opinion. In all other respects, the decree is affirmed.

BATES, C.J., PARRISH, J., SHRUM, J., and BARNEY, J., concur.

PREWITT, J., concurs with Judge RAHMEYER'S opinion.

RAHMEYER, J., concurs in part and dissents in part in separate opinion.

NANCY STEFFEN RAHMEYER, Judge, concurring in part and dissenting in part.

I respectfully dissent from the portion of the majority opinion which reverses the child support and the amount of maintenance awarded. The trial court's decision to impute income was based on its findings that Father's testimony regarding the voluntariness of Father's reduction of income and the thoroughness of his subsequent job search were not credible, and I believe that we must defer to the trial court's determination of credibility regarding the factual issues governing whether the imputation of income was appropriate. This Court's determination that "the income and standard of living in the Buchholz family would have diminished whether the marriage had dissolved or not" is contrary to the express credibility determinations made by the trial court.

Although the majority opinion gives lip service to the standard of review, the opinion fails to apply any deference to the findings of the trial court and instead chooses to decide the case *de novo*. The majority opinion states, "the evidence is conflicting about [the] reasons"[1] for the financial difficulties of the business and

1. The acknowledgement that the evidence is conflicting alone should provide the basis for deferring to the trial court.

"there was a suggestion that increased competition from discount retailers contributed to it." The majority opinion adopts the suggestion of increased competition as the sole basis for its conclusion that Husband's decrease in income was involuntary. Furthermore, the majority opinion cites as "fact" that Wife refused to sign documents which would have provided financing to the corporation. The trial court, who actually heard the parties testify, made a specific finding that Husband's testimony "in this regard [was] totally lacking in credibility." The court found that "the overwhelming evidence suggest[ed] that [Husband] repeatedly failed to provide requested financial records and information to lenders despite numerous requests from those lenders and creditors."

Our standard of review requires that we sustain this judgment unless it lacks substantial evidentiary support, is against the weight of the evidence, or erroneously declares or applies the law. *In re Marriage of Gerhard*, 985 S.W.2d 927, 930 (Mo.App. S.D.1999). The decision to impute income involves the exercise of discretion, however, and we must review such a decision under the abuse of discretion standard. *See Peniston v. Peniston*, 161 S.W.3d 428, 433 (Mo.App. W.D.2005); *Stanton v. Abbey*, 874 S.W.2d 493, 499 (Mo.App. E.D. 1994). Additionally, this Court must give due regard to the trial court's opportunity to assess witness credibility and give deference to the trial court's factual findings. Rule 84.13(d)(2); *Ussery v. Ussery*, 156 S.W.3d 810, 814–815 (Mo.App. S.D.2005). The trial court is better positioned than the appellate court to determine the credibility of witnesses, their sincerity and character, and other trial intangibles not apparent in the record. *Greentree Properties, Inc. v. Kissee*, 92 S.W.3d 289, 293 (Mo.App. S.D.2002). The trial court is therefore free to believe or disbelieve part,

all, or none of the testimony of any witness, and may disbelieve even uncontradicted testimony. *Shelby v. Shelby*, 130 S.W.3d 674, 678 (Mo.App. S.D.2004); *Linton v. Linton*, 117 S.W.3d 198, 207 (Mo. App. S.D.2003). "When determining the sufficiency of the evidence an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989).

We, therefore, must ascertain whether substantial evidence supports the court's finding and, accept as true, the *court's* credibility determination of Husband's testimony. A review of the evidence indicates ample testimony exists supporting the trial court's decision regarding the voluntariness of Husband's financial demise. The most convincing evidence is that Husband testified extensively that his financial demise and ultimate bankruptcy were due to Wife's refusal to cooperate with Husband's efforts to refinance the business. In other words, Husband testified that the demise of the business was involuntary; were it not for Wife's refusal to cooperate, the business would have been refinanced and it would have continued. Husband does not attribute the demise of the business to increased competition. Although it is possible that the business would have faced more competition from discount retailers than it did in the past, Husband's testimony indicated that the main impediment affecting the health of his business was Wife's refusal to cooperate.

The trial court found Husband's testimony to be totally lacking in credibility, however, and the majority opinion overlooks and fails to cite the evidence which contradicted Husband's. Essentially, the majority overlooks the evidence that indicates that Husband's financial demise was volun-

tary. Wife offered evidence of letters from two of the business' lenders stating that Husband had failed to provide the necessary financial information to avoid default. Despite receiving these letters, Husband did not prepare the requested financial statements. All of this evidence, particularly the letters indicating that Husband intentionally defaulted on the loans, provided substantial evidence for the trial court's conclusion that Husband voluntarily reduced his income without justification. That premise, that Husband intentionally reduced his income without justification, forms the basis for the award of maintenance and child support.

Moreover, Wife also presented further evidence indicating that Husband voluntarily reduced his income by detailing the financial success of Husband's live-in girlfriend, Sue Rink. Husband was romantically involved with Rink, his personal assistant, when Husband and Wife separated in 1993. Husband testified that in 1997, Rink became the second-highest manager of the company. Husband also testified that from 1998 to 2002, Rink was paid more than any other employee of the company, other than Husband. According to Husband, Rink accumulated various real property interests, including 60 acres in Christian County, Missouri, and a home in Greene County, Missouri, during her employment with the company. Rink also bought and sold a condominium in Greene County during her time with the company, and Husband paid the dues on her condo on more than one occasion. Although Rink did not testify and explain how she acquired the real estate, Husband testified that he was unaware that Rink had any other sources of income to use to make these purchases other than her income from her employment at Colony Magnavox. Furthermore, Husband also did not adequately explain why $175,000 was shown as missing from the company's in-

ventory, nor could he explain multiple deposits and withdrawals of $15,000 from his personal banking account. As the trial court noted, Husband's girlfriend was the one person who had "apparently flourished financially in the aftermath of" Husband's bankruptcy.

Given that Husband and Rink were involved romantically during her employment with Colony and that they moved in together shortly after Husband and the business declared bankruptcy, Rink's financial flourish provided ample evidence for the trial court to question the voluntariness of the demise of the business. Furthermore, as mentioned above, the trial court found Husband's explanation that the bankruptcy was involuntary to be totally lacking in credibility. Thus, the trial court had substantial evidence to conclude that Husband voluntarily reduced his income.

Accordingly, I disagree with the majority's conclusion that nothing in the record indicated that Husband's diminished income was the result of a deliberate or voluntary attempt to avoid his support obligations to his family. The timing of the events surrounding the collapse of the business illustrates Husband's decision to dissipate the marital estate. Husband attempted to obtain additional financing and his lenders requested that he send them financial information necessary to secure financing. After Wife filed for divorce, Husband refused to provide the requested financial information to his lenders. The business collapsed, both Husband and the business filed for bankruptcy, and Husband moved to Ohio to live with his girlfriend. The trial court had sufficient evidence to support its conclusion that Husband voluntarily reduced his income to escape his responsibilities to his family, and to the extent that the trial court based its conclusion

on its credibility determinations and factual findings, we are obligated to defer to its conclusion. *See Hill v. Hill,* 53 S.W.3d 114, 117 (Mo. banc 2001).

I find further support for the trial court's decision to impute income in its findings that Husband failed to use his "best efforts" to obtain a new job after his business collapsed. The trial court found that Husband is currently underemployed and that he failed to use his best efforts in maximizing his earning potential in his new job. According to the trial court, Husband's testimony explaining that he put forth his best efforts to find employment was, like his testimony regarding the demise of the business, not credible. The majority opinion, while again stating as fact that Husband did put forth his best efforts, cites as fact that Husband sent at least thirty resumes to prospective employers in the general area of Independence, Kentucky, and that he had at least twenty-two interviews with only one job offer. The record does include at least thirty cover letters, but it is impossible to tell from the letters whether any of them were actually sent or not. Additionally, although Husband testified to approximately twenty-two "interviews," the number of companies he claimed to interview with was only eleven. The majority opinion uses the additional contacts Husband claims to have had with the eleven companies to arrive at twenty-two interviews. But again, the trial court found that Husband's testimony regarding the sufficiency of his job search was not credible. I believe we should defer to that determination. *Id.*.

Despite working in the electronics retail business in Springfield for 23 years, Husband limited his job search to Cincinnati, Ohio, which is an area where he was unlikely to have any business contacts. Husband did not apply to any retail or sales businesses in the Springfield area. If Husband truly wanted to capitalize on his management and sales experience, I believe, as the trial court likely did, he would have at least tested the market in the area where he spent 23 years building his business reputation by sending his resume to at least one business in the area. Instead, he limited his search to an area where business owners would have been unfamiliar with the success of his business in prior years. The trial court thus had substantial evidence to conclude that Husband is currently underemployed because he failed to use his best efforts to obtain a new job and the court justifiably imputed income on those grounds.

For the reasons above, the trial court's decision to impute income was not an abuse of discretion. Furthermore, I believe the trial court had substantial evidence to set the imputed income at the level that it did. In *Garrison,* we overturned the trial court's imputation of income to the husband because the imputed figure itself was not supported by substantial evidence. *In re Marriage of Garrison,* 846 S.W.2d 771, 776–77 (Mo.App. S.D. 1993). Although we found that the trial court did properly impute income, we concluded that the amount of imputed income was not supported by the record. *Id.* We found that the wife offered no evidence that the husband had the capital, access to capital, or the entrepreneurial abilities to start a new business that would generate income at the level of the imputed income. *Id.* at 776. We also found that the wife did not offer any evidence that the husband had management skills, experience, education, or other background that would persuade someone to hire him at the level of the imputed income. *Id.*

Here, unlike *Garrison,* the record includes Husband's income for the years im-

mediately preceding the dissolution. "[C]ourts must look at past and present income *in toto* and consider a party's complete earning history as evidence of ability to pay maintenance." *In re Marriage of Baker,* 986 S.W.2d 950, 955 (Mo.App. S.D. 1999). Averaging income to project a continuing level of income is permissible. *In re Marriage of Kohring,* 999 S.W.2d 228, 234 (Mo. banc 1999). Furthermore, the record does show that Husband had the management skills, experience, and education to earn the level of income he earned in the three years prior to the dissolution. Without such experience and education, Husband would not have been able to earn what he did in those years as he worked his way into the ownership of the business. Additionally, the record contained evidence from which the trial court could have found that Husband had access to capital to start a new business or to continue his former one. The banks refused further loans because Husband did not submit proper paperwork for the loans, not because of the economic demise of the business.

In *Ussery,* this Court deferred to the credibility findings of the trial court when it found that the appellant was voluntarily underemployed when it was undisputed that the appellant had diabetes and had lost his license for failure to pay child support pursuant to section 454.1003.1(1). *Ussery,* 156 S.W.3d at 814–15. This Court relied upon the trial court's findings, which indicated that the appellant had presented no evidence concerning the availability, or lack of availability, of alternate transportation. *Id.* at 814. In affirming the trial court, this Court used an abuse of discretion standard. *Id.* at 815.

Likewise, in *Linton,* this Court deferred to the "trial court's implied assessment" that Wife was underemployed. *Linton,* 117 S.W.3d at 208. Again, citing our standard of review and prior cases, we noted that the trial court determines credibility and assigns weight to evidence and testimony. *Id.* We correctly cited substantial case law that the trial court was not confined to a consideration of present earnings but could consider prior earning capacity and probable future prospects. *Id.*

Thus, because the Husband had the capacity to earn income at the level of the imputed income, but voluntarily refused to do so, the trial court properly calculated the amount of imputed income. I would therefore affirm the entire decision of the trial court.

