

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| JEFFREY K. ELNICKI, | ) | No. ED99455 |
| | ) | |
| Plaintiff/Appellant, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | |
| | ) | Honorable Dale W. Hood |
| MICHELLE D. CARRACI, | ) | |
| | ) | |
| Defendant/Respondent. | ) | Filed: May 27, 2014 |

## I. INTRODUCTION

Jeffrey K. Elnicki ("Father") appeals the judgment of the Circuit Court of St. Louis County modifying the terms of child support paid to Michelle Caracci ("Mother") for care of their sole child ("Child"), a daughter, born during the marriage. Father raises nine points of error on appeal. Specifically, Father claims the trial court erred by: (1) imputing additional salary income to him, because the evidence does not support the trial court's finding that he was underemployed; (2) imputing additional capital gains to him, because the evidence does not support the trial court's finding that he underreported his capital gains income; (3) imputing additional yearly income to him based on a one-time inheritance; (4) determining the amount of child support and expenses that are reasonable and necessary for Child's care; (5) ordering him to pay child support until Child is twenty-two years old; (6) requiring him to pay 100% of Child's out-of-state college

tuition, as well as room, board, meals, travel, and study abroad; (7) allowing evidence on the issues of Child's college expenses and the date Father's support obligation terminates, because those issues were not properly pled or tried by consent; (8) ordering him to pay Mother's attorneys fees of over $165,000; and (9) denying his motion to disqualify the trial judge for prejudice.

We affirm the trial court's decision to receive evidence on the issues of Child's college expenses and the date Father's support obligation terminates. We also affirm the denial of Father's motion to disqualify the trial judge. We reverse the remainder of the trial court's judgment and remand for further proceedings consistent with this opinion.

## II. BACKGROUND

Father and Mother divorced in 1990. Several amendments and modifications regarding custody, visitation, and support of Child would follow. The first of these proceedings occurred in 1992, when the parties filed a motion to re-open the dissolution in order to amend their separation agreement. They agreed that Mother would have primary custody of Child and that Father would pay $600 per month in child support, which represented 74% of the cost of Child's care. Father agreed to maintain health insurance for Child through his work and pay 74% of any uncovered medical expenses. The parties also agreed to set up a college fund for Child, anticipating that they would share equally in the cost of Child's college education, and that Father would pay child support until Child reached twenty-two years of age. The trial court entered judgment to this effect. Though Father received visitation rights in the agreement, he has since had almost no contact with Child.

In 1996, Mother filed a motion to modify the separation agreement. After a hearing and by consent of the parties, the trial court entered judgment increasing Father's support obligation to $736 per month. The parties' agreement also stipulated that Father would pay for 100% of Child's uncovered medical expenses.

In 2000, Mother filed a motion for contempt. After a hearing, the parties consented to another amended agreement. The agreement provided that parties would alternate the years in which they would claim a dependency exemption for support of Child on their federal and state tax returns. The trial court entered judgment to this effect.

In 2005, Mother filed the instant motion to modify, requesting a retroactive increase in Father's monthly child support payments, various extraordinary child-rearing expenses, the dependency exemption for all years, and attorney's fees for prosecuting the action. In the summer of 2006, shortly before the motion to modify was heard, Father filed a motion to disqualify trial judge Dale W. Hood for cause. Father alleged that Judge Hood had shown bias throughout the pre-trial proceedings. Judge Hood denied Father's motion without an evidentiary hearing and proceeded to hear Mother's motion to modify.

In its 2007 judgment, following an evidentiary hearing, the trial court found that Father, an attorney, was not earning a salary commensurate with other similarly situated attorneys in the St. Louis area. Though Father's full-time salary at the time of the judgment was $58,875 per year, the trial court imputed $100,000 per year in salary income to him. The trial court also found that Father deliberately underreported his income from premature IRA withdrawals and then imputed $11,618 in investment income. Lastly, the trial court imputed $17,446 in annual capital gains income based on

Father's average reported capital gains between 2003 and 2005. In all, the trial court imputed to Father an income of $129,064 per year.

Based on this imputed income figure and its own Form 14 calculation, the trial court ordered Father to pay retroactive child support $1,154 per month from the time of the 2007 judgment to the time the modification was filed in 2005. The trial court ordered Father to pay $1,263 per month prospectively. The trial court also specified that Child's college expenses would be split evenly between the parties, and ordered Father to pay Mother's attorney's fees of $25,958.

Father appealed the trial court's 2007 judgment, and in *Elnicki v. Caracci*, 255 S.W.3d 44, 50 (Mo. App. E.D. 2008), this Court held that the trial court erred by failing to permit Father an evidentiary hearing on his motion to disqualify Judge Hood. This Court remanded for an evidentiary hearing on Father's motion and for a new trial on Mother's motion to modify.

On remand, Judge Michael D. Burton conducted an evidentiary hearing on Father's motion to disqualify Judge Hood. Father argued that Judge Hood was hostile to him throughout the proceedings, for example, by stating that Father "dodged a bullet" by settling a contempt motion before the court could rule on it. However, Judge Burton did not find credible Father's testimony that Judge Hood made the complained-of statement. Judge Burton also noted that even if Judge Hood had made such a statement, it would have been warranted due to the repeated failures of both parties to follow pre-trial instructions. Judge Burton denied Father's motion and Judge Hood proceeded to re-try Mother's motion to modify.

In the summer of 2012, after a hearing at which all parties were present and evidence was received, the trial court entered its second judgment on the motion to modify, which imposed even greater financial obligations on Father. Again, the trial court found that Father's salary was not commensurate with other similarly situated attorneys in the St. Louis area. Though Father's salary had dropped to $46,411 by 2010, the trial court imputed a salary of $115,000 to him. Father's reported capital gains had also dropped by the time of the 2012 judgment to an average of approximately $93 per year between 2006 and 2011.[1] However, the trial court concluded that Father was deliberately hiding capital gains income and imputed annual capital gains of $16,860. The trial court also imputed annual income of $16,600 based on Father's receipt in 2008 of a one-time inheritance of $83,000 from his parents' estate. In all, the trial court imputed to Father annual income of $148,460.

The trial court also found that the reasonable and necessary expenses for Child's care were significantly greater than the amount set in the 2007 judgment. The trial court rejected Form 14's presumptive child support guidelines and independently calculated Father's support obligations. First, the trial court ordered Father to pay support of $1611 per month from July 1, 2005, to June 30, 2007; $1719 per month from July 1, 2007, to July 31, 2010; and $1905 per month from August 1, 2010, until the termination of Father's support obligation. Second, the trial court ordered Father to pay $11,791 for the cost of Child's car; $3244 for softball; $886 for camps, conventions, and driving school expenses; $8577 for computer expenses; $608 in senior high school expenses; and $972 for college preparation and visits. Third, the trial court ordered Father to pay for 76% of

---

[1] In the years 2006 to 2011, Father's reported capital gains were: $110, $112, $112, $112, $56, and $57.

5

Child's college expenses, including 100% of Child's out-of-state college tuition at the University of Kansas-Lawrence, as well as room, board, meals, travel, and study abroad. Fourth, the trial court ordered Father to pay Mother's attorney's fees, which had ballooned from $25,958 at the conclusion of the first trial to $165,982 by the time of the 2012 judgment. In total, the trial court ordered Father to pay $366,088 to Mother.[2] The court further ordered Father to continue to pay support consistent with the judgment until Child reached twenty-two years of age in the summer of 2013. This appeal follows.

### III. STANDARD OF REVIEW

"We will not disturb an order modifying a child support obligation unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Forde v. Forde*, 190 S.W.3d 521, 527 (Mo. App. E.D. 2006). "We will interfere with the award [of child support and expenses] only if the trial court abused its discretion by ordering an amount that is 'against the logic of the circumstances' or is 'arbitrary and unreasonable.'" *Id.* (quoting *Ponce v. Ponce*, 102 S.W.3d 56, 60 (Mo. App. W.D. 2003)). We also review for abuse of discretion the trial court's imputation of income, *In re Marriage of Crow and Gilmore*, 103 S.W.3d 778, 783 (Mo. banc 2003), decision to amend the pleadings to conform to the evidence, *Wheeler ex rel. Wheeler v. Phenix*, 335 S.W.3d 504, 510 (Mo. App. S.D. 2011), award of attorney's fees, *Nichelson ex rel. Lohrasbi v. Roberts*, 164 S.W.3d 179, 183 (Mo. App. E.D. 2005), and denial of a motion to disqualify a judge, *Elnicki*, 255 S.W.3d at 48. "We view facts

---

[2] This figure includes: $91,878 in retroactive child support; $11,791 for the cost of Child's car; $3244 for softball; $886 for camps, conventions, and driving school expenses; $8577 for computer expenses; $608 in senior high school expenses; $972 for college preparation and visits; $82,183 for college expenses; and $165,982 in attorney's fees.

6

and reasonable inferences in the light most favorable to the trial court's decision and defer to the trial court's superior ability to determine the credibility of witnesses." *Forde*, 190 S.W.3d at 527.

## IV. DISCUSSION

### 1. Imputing Earned Income

In his first point, Father argues the trial court erred by imputing salary income of $115,000 per year to him, when his full-time salary as an attorney between 2002 and 2010 averaged approximately $55,000.[3] Father contends that imputing salary income was erroneous, because there was no substantial evidence that he voluntarily or deliberately reduced his salary by refusing to work. Mother responds that the trial court properly imputed income, because Father was not earning at a level commensurate with his experience as an attorney and "utter[ly] fail[ed] to be candid as to issues of his income."

"The theory behind imputing income to a spouse/parent is directed toward preventing a [parent] from escaping responsibilities to the family by deliberately or voluntarily reducing his or her income." *Buchholz v. Buchholz*, 166 S.W.3d 146, 152 (Mo. App. W.D. 2005). "In order to avoid such a situation, a court may, in proper circumstances, impute an income to a [parent] according to what that [parent] could earn by use of his or her best efforts to gain employment suitable to that [parent]'s capabilities." *Id.* at 153 (quoting *Jensen v. Jensen*, 877 S.W.2d 131, 136 (Mo. App. E.D. 1994)). "What constitutes 'proper circumstances' depends on the facts and must be determined on a case-by-case basis, but includes a situation where a parent has

---

[3] Father's salary in the years 2002 to 2010 as reported on his federal tax returns is as follows: $52,249, $56,202, $56,840, $57,428, $61,369, $58,875, $62,508, $37,994, $46,411.

7

voluntarily reduced his income without justification." *Id.* "Also included are situations where a parent involuntarily lost a job but, (1) failed to use his or her best efforts to obtain a new job, (2) refused to accept employment offers, or (3) failed to show that the unemployment was other than temporary." *Id.* "Courts do not, however . . . compel [parents] to obtain employment which will generate the maximum possible income to support their children, or to mandate the employment which a [parent] is required to take." *Id.* (citing *Smith v. Smith*, 969 S.W.2d 856, 859 (Mo. App. E.D. 1998)); *see also Payne v. Payne*, 206 S.W.3d 379, 385 (Mo. App. E.D. 2006); *Wuelling v. Brown*, 341 S.W.3d 157, 159 (Mo. App. E.D. 2011).

Here, the trial court found that Father was "underemployed in that his income is not commensurate with that of other [tax] attorneys in the St. Louis metropolitan area with his same skills, education, experience, and work history." The trial court concluded that the "lack" of credible evidence that Father "diligently searched for a job [as a tax attorney] to optimize his earning potential" justified imputing salary income.

This conclusion is based on an erroneous application of the law and is unsupported by substantial evidence. First, the trial court erroneously applied the law by imputing income due to Father's failure to obtain the type of job that would "optimize" his earning potential. "Courts do not . . . compel [parents] to obtain employment which will generate the maximum possible income to support their children, or mandate the employment which a [parent] is required to take." *Buchholz*, 166 S.W.3d at 153. While we recognize that the income level of other individuals with similar skills, education, experience, and work history may provide a court with some guidance in determining a parent's hypothetical earning potential once the court has determined that imputing

8

income is appropriate, courts do not make the initial decision to impute income based on a parent's failure to keep up with someone else's level of earnings, nor mandate that a parent work a certain type of job to attain it.[4]

Second, the record does not reflect any substantial evidence that Father deliberately reduced his salary in order to avoid his obligation to support Child. "[I]t is axiomatic that there must be evidence to support a finding that the parent is *deliberately* limiting his or her work to reduce income before it is appropriate to impute income." *Peniston v. Peniston*, 161 S.W.3d 428, 434 (Mo. App. W.D. 2005) (emphasis added) (quoting *Davis v. Dept. of Soc. Servs.*, 21 S.W.3d 140, 141 (Mo. App. W.D. 2000)); *see also State ex rel. Atkinson v. Anthony*, 947 S.W.2d 832, 834 (Mo. App. W.D. 1997) (explaining parent must have "voluntarily decline[d] to work, . . . deliberately limit[ed] his work to reduce income, or . . . otherwise [purposefully] disable[d] himself financially" (citations omitted) (quoting *AlSadi v. AlSadi*, 823 S.W.2d 123, 126 (Mo. App. S.D. 1992))). Though the trial court concluded there was a "lack" of credible evidence that Father diligently endeavored to earn as much as he could, there is no legal presumption in favor of imputing income to a parent who fails to demonstrate diligent efforts to optimize his salary. Rather, there must be substantive evidence to support a

---

[4] We also note that "[a] parent must have the capacity to earn [the] income which is imputed to him or her." *Monnig v. Monnig*, 53 S.W.3d 241, 245 (Mo. App. W.D. 2001) (alteration in original) (quoting *Walker v. Walker*, 936 S.W.2d 244, 248 (Mo. App. S.D. 1996)). Though Mother's expert testified that a tax attorney with Father's experience could earn the $115,000 salary imputed by the trial court, the record shows that Father has never actually earned such a salary. In fact, the trial court's salary figure is more than two times larger than Father's actual, average salary between 2002 and 2010 of approximately $55,000. Further, the imputed figure is $30,000 higher than the highest salary Father has ever earned, approximately $85,000 per year from 1998 to 2001, since he began practicing law twenty-five years ago.

finding that the parent deliberately limited his or her earnings to avoid child support payments. *See Peniston*, 161 S.W.3d at 434; *Atkinson*, 947 S.W.2d at 834. Here, neither the record, nor the trial court's judgment reflects any such evidence. In fact, the trial court found that Father had consistently worked full-time as an attorney from 1992 to the date of the judgment.[5] *Cf. Cross v. Cross*, 318 S.W.3d 187, 192 (Mo. App. W.D. 2010) ("The most common scenario for voluntary reduction of income without justification is where a parent deliberately quits work to reduce his or her child support [payments]." (quoting *Peniston*, 161 S.W.3d at 434)); *Hoffman v. Hoffman*, 423 S.W.3d 869, 877-78 (Mo. App. E.D. 2014) (holding substantial evidence supported trial court's finding that father voluntarily reduced income without justification, because father ran failed business, had earned no income for several years before judgment, and failed to seek other employment).

In sum, while the trial court may have found evidence to support the conclusion that Father's career has not been as profitable as that of some attorneys in Missouri, it did not find any substantive evidence of a deliberate attempt by Father to escape his responsibility to Child. Accordingly, we reverse the trial court's imputation of income from Father's work as an attorney.

---

[5] The trial court found that Father was employed as an attorney with (1) Bryan, Cave, McPheeters & McRoberts from 1992 to 1996, earning approximately $60,000 per year; (2) the Missouri Attorney General from 1996 to 1998, earning between $35,000 and $39,000 per year; (3) Lowenhaupt & Chasnoff from 1998 to 2001, earning between $82,000 and $85,000 per year; and (4) McCarter & Greenley from 2001 to 2009, earning approximately $60,000 per year. Father worked as a solo-practitioner from 2009 to the time of the trial court's judgment in 2012, earning approximately $39,000 per year.

## 2. Imputing Capital Gains

In his second point, Father argues that the trial court erred by imputing capital gains income of $16,860 per year to him, when his reported capital gains averaged approximately $6600 per year from 2003 to 2010.[6] Father contends that the record contains no evidence to support the trial court's conclusion that he realized more capital gains income than he reported. Mother responds that the trial court properly imputed capital gains, because Father's capital gains fell to almost zero at roughly the same time that Mother filed the instant motion.

Again, courts "impute income to a parent in order to prevent the parent from escaping responsibilities to the family by deliberately or voluntarily reducing income." *Wightman v. Wightman*, 295 S.W.3d 183, 190 (Mo. App. E.D. 2009). A parent "underreports" his or her income "where the parent may be sufficiently employed, but has hidden the true extent of his or her [total] income . . . in an attempt to avoid child support." *Ricklefs v. Ricklefs*, 39 S.W.3d 865, 875 (Mo. App. W.D. 2001). But there must be some substantive evidence that the parent is deliberately underreporting his or her income before it is appropriate to impute income. *Cf. Peniston*, 161 S.W.3d at 434 ("[T]here must be evidence to support a finding that the parent is deliberately limiting his or her work to reduce income before it is appropriate to impute income." (quoting *Davis*, 21 S.W.3d at 141)).

Here, the trial court concluded that there was "no credible evidence that [Father's] finances were accurately reported nor that any net proceeds were not financial resources

---

[6] Father's reported capital gains in the years 2003 to 2005 were, respectively, $26,454, $2569, $23,316. In the years 2006 to 2011, his reported capital gains were $110, $112, $112, $112, $56, and $57. The trial court averaged Father's gains between 2003 and 2005 to reach the $16,600 figure.

from which he personally benefited." The trial court further concluded that Father "borrowed funds for investment purposes to deliberately confuse and obfuscate his financial statements in a devious and calculated effort to create the appearance of a diminished financial capacity." In support, the trial court found that Father maintained a number of bank accounts, evidencing "deposits of thousands of thousands of dollars in excess of his declared annual income." The trial court focused in particular on a $47,583 check which Father deposited in his checking account in 2004. The check was payable to "J.K. Products" and Father endorsed it as "managing partner." The court took this check as proof that Father was receiving income from an unreported source.

Having examined the record on appeal, including the parties' exhibits at trial, we recognize that Father's financial records are both voluminous and messy. However, difficulty in deciphering his financial records does not explain the lack of substantive evidence in the trial record that Father actually realized more capital gains income than he reported. First, the trial record shows that the "thousands of thousands of dollars" of deposits spotted by the trial court are actually funds borrowed against Father's numerous lines of credit. Money borrowed on a personal line of credit is not income. *See Luker v. Luker*, 861 S.W.2d 195, 199 (Mo. App. W.D. 1993); *but see Keller v. Keller*, 224 S.W.3d 73, 90 (Mo. App. S.D. 2007) ("Retained earnings or loans from corporations to sole shareholders may be considered part of the shareholder's gross income . . . ."). Second, the trial record shows nothing nefarious about the $47,583 check that Father endorsed. Father borrowed approximately $50,000 against his lines of credit, attempted to purchase $50,000 worth of stock in a bank's initial public offering, actually succeeded in purchasing only $2417 worth, and was refunded the remaining $47,583 from the bank.

12

"J.K. Products" was simply a state-registered designation under which Father made the investment.[7] *See generally* § 417.200, R.S.Mo. (2000) (permitting individuals and entities to conduct business under a "fictitious name," commonly known as a "d/b/a" or "doing business as" designation).

Aside from these two facts, we are left only with the trial court's conclusion that there was "no credible evidence that [Father's] finances were accurately reported." But a *lack* of evidence that Father accurately reported his income is not equivalent to the *presence* of evidence that he did not. Because the record is void of substantial evidence that Father deliberately underreported his income, we reverse the trial court's imputation of capital gains.

### 3. Imputing Income from One-Time Inheritance

In his third point, Father argues that the trial court erred by imputing income of $16,600 per year to him on the basis of a one-time inheritance of $83,000 from his parents' estate. Father contends that no Missouri case supports imputing yearly income on the basis of a one-time inheritance, and that the trial court's imputation of $16,600 per year from the time of the 2005 modification amounts to far more than the $83,000 he inherited. Father further claims that the entirety of the inheritance had already been spent to pay off credit card debt by the time of the judgment. Mother contends that no resource available to Father is exempt from the obligation of child support.

It is true that "[t]he trial court should consider not only a parent's earnings for services rendered, but rather all resources available to him or her. No resource available

---

[7] The trial court also pointed out that Father endorsed checks for J.K. Products as late as 2008. The record reveals, however, that apart from the $47,000 refund check in 2004, the few subsequent JK Products checks were for no more than $13 each.

to a parent is exempt from the obligation to support [his or her] child[], including the largesse to the parent from a third party." *Thurman v. Thurman*, 95 S.W.3d 172, 175-76 (Mo. App. W.D. 2003) (quoting *In re Marriage of Petersen*, 22 S.W.3d 760, 764 (Mo. App. S.D. 2000)).

Even so, Father argues—and we agree—that there are two conspicuous errors in the trial court's treatment of Father's inheritance. First, the trial court included $16,600 in inheritance in its calculation of Father's total annual income from 2005 to 2007. But Father did not receive the inheritance until 2008. Thus, the trial court attributed inheritance income to Father even before he received it. Second, the trial court imputed $16,600 in inheritance each year for nine years between 2005 and 2013, which amounts to $132,400 in total inheritance. But Father actually received only $83,000 in inheritance. Thus, the trial court attributed $49,800 more to Father than he actually received. Both of these errors demonstrate that the trial court's imputation of inheritance income was against the weight of the evidence.

Moreover, the trial court provided no explanation for how or why it reached the yearly $16,600 figure in regard to the inheritance. Wife provides no authority, and we find no precedent for this apparent amortization of Father's one-time inheritance. In most circumstances, if a parent receives a one-time windfall, the trial court should consider the money as a discrete resource available to satisfy the parent's existing child support obligation, *see Thurman*, 95 S.W.3d at 175-76, not as a source of recurring gross income used in calculating the amount of monthly child support payments.[8] Accordingly, the trial

---

[8]   We do recognize, however, that a parent may rely in large part on a one-time windfall for his or her own support. For instance, a parent might use an inheritance to quit work and go back to college, *see id.*, to substantially elevate his or her standard of living,

14

court's findings regarding Father's inheritance were against the weight of the evidence. We reverse the trial court's imputation of income from Father's one-time inheritance.

## 4. Calculating Amount of Child Support and Extraordinary Expenses

In his fourth point, Father argues that the trial court erred in determining the amount of child support and expenses that are reasonable and necessary for Child's care. Specifically, Father contends that the trial court failed to consider his ability to afford the ordered payments.[9] Mother contends that the trial court was free to set child support at the amount it believed to be reasonable and necessary to meet Child's needs, and free to conclude that Father had the ability to pay based on his imputed income.

"The primary purpose of child support is to provide for the child['s] welfare." *In re Marriage of Bottorff*, 221 S.W.3d 482, 487-88 (Mo. App. S.D. 2007). However, "[t]he trial court is required to balance the needs of the child against the obligor's ability to pay." *Windsor v. Windsor*, 166 S.W.3d 623, 634-35 (Mo. App. W.D. 2005). "[A]n award of child support . . . should [not] be so great as to destroy the [parent's] initiative or impair his [or her] position." *In re Marriage of Quintard*, 735 S.W.2d 388, 291 (Mo. App. S.D. 1987). "Importantly, the award [of child support and expenses] 'must be supported by evidence of the parent's ability to pay.'" *Barrett v. Barrett*, 963 S.W.2d 454, 457-58 (Mo. App. E.D. 1998) (quoting *Holmes v. Holmes*, 878 S.W.2d 906, 909

---

or to simply retire. In such circumstances, it may be appropriate for a court to account for the windfall in determining the parent's ongoing, monthly support obligation.

[9] Father also claims the trial court (1) improperly categorized certain expenses as extraordinary, (2) computed other expenses redundantly, and (3) included unnecessary and unreasonable expenses in the award. Insofar as these issues were preserved by Father's brief on appeal, we need not address them specifically. We reverse the trial court's award of child support and expenses on other grounds.

(Mo. App. E.D. 1994)); *J.L.M. v. R.L.C., Jr.*, 132 S.W.3d 279, 289-91 (Mo. App. W.D. 2004).

Here, the trial court ordered Father to pay support of $1611 per month from July 1, 2005, to June 30, 2007; $1719 per month from July 1, 2007, to July 31, 2010; and $1905 per month from August 1, 2010, until the termination of Father's support obligation. The trial court additionally ordered Father to pay $11,791 for the cost of Child's car, $3244 for softball, $886 for camps, conventions, and driving school expenses, $8577 for computer expenses, $608 in senior high school expenses, and $972 for college preparation and visits. In total, the judgment required Father to pay $117,956 in retroactive child support and expenses, excluding the substantial college expenses and attorney's fees which we address later in this opinion. The court further ordered Father to continue to pay support consistent with the judgment until Child reached twenty-two years of age in the summer of 2013.

Here, as we have explained, the trial court erroneously imputed salary, capital gains, and inheritance income to Father. These errors fatally undermine the trial court's appraisal of Father's total income, i.e., the monies actually available to satisfy his support obligation. Such an erroneous assessment of Father's income cannot support the conclusion that he has the ability to pay the amount of child support awarded.

Because we reject trial court's imputation of income, there remains insufficient evidence in the record to justify the amount of this award. For instance, Father's reported, gross income in 2010 was $46,478. Thus, the trial court's $1905 child support award beginning August 1, 2010, would consume roughly half of Father's monthly, pre-tax

16

income, and leave Father to live on the equivalent of $23,616 per year, before accounting for the trial court's award of $274,210 in other expenses and fees.

Given the trial court's erroneous assessment of Father's income, and given the lack of any other evidence that Father can afford the trial court's considerable support award, the trial court's award of support and expenses is unsupported by substantial evidence of Father's ability to pay. Accordingly, we reverse the trial court's award of child support and expenses.

### 5. Requiring Support until Child Reaches Twenty-Two Years Old

In his fifth point, Father argues that the trial court erroneously determined that he must pay child support until Child is twenty-two years old, because current Missouri law requires support only until Child reaches twenty-one. *See* § 452.340.5, R.S.Mo. (Cum. Supp. 2008). The trial court reasoned that Father should pay support for longer than the present law requires, because the parents' 1992 separation agreement committed him to do so. Father contends that the agreement only shows his intent to pay support consistent with the minimum requirement of the law in effect at the time of the agreement, because the law in effect at the time of the agreement required support until Child reached twenty-two. *See* § 452.340.5, R.S.Mo. (Cum. Supp. 1990). Mother responds that the agreement's language is inconsistent with the law at the time, and actually commits Father to provide more support than was required.

"[T]he parties may agree that child support can be extended beyond the majority of the child. In short, the parties may agree to do more for the child than the law requires, and the court will not interfere with that undertaking . . . ." *Kocherov v. Kocherov*, 775 S.W.2d 539, 540 (Mo. App. W.D. 1989). "But if there is a conflict or disagreement

17

between a judgment of [support] and the requirements of section 452.340.5, the statute will control 'so as to avoid conflict with Missouri law.'" *Shands v. Shands*, 237 S.W.3d 597, 601 (Mo. App. S.D. 2007) (quoting *Schottel–Lehde v. Schottel*, 75 S.W.3d 359, 364 (Mo. App. W.D. 2002)). Accordingly,

> when a [parent] agree[s] to make child support payments until the child reache[s] its majority, and such agreement d[oes] not express an intent to incur a greater liability than that imposed by law, the obligation to pay support terminate[s] when the child reache[s the present age of majority], even though the decree was entered prior to the effective date of the statute lowering the age of majority.

*Kocherov*, 775 S.W.2d at 542-43.

Here, the provision of the parties' 1992 agreement setting the conditions for termination of Father's support obligation and the minimum statutory requirements in effect at the time are almost indistinguishable. In pertinent part, the 1992 agreement specifies:

> [T]he Petitioner's child support obligation shall be terminated when the child (1) dies, (2) marries, (3) enters active duty in the military, (4) becomes self-supporting, (5) becomes emancipated, (6) attains age 18 unless the child is enrolled in and attending a secondary school program of instruction on the child's 18th birthday, in which case payments shall terminated upon the child's attainment of age 21 or completion of the program, whichever occurs first or (7) upon her attainment of age 22 or completion of her college education, whichever occurs first, provided the child is enrolled in college on the October 1 following graduation from secondary school and only for so long as the child continues to attend college.

Likewise, the version of section 452.340, R.S.Mo. (Cum. Supp. 1990), in effect at the time provided:

> [T]he obligation of a parent to make child support payments shall terminate when the child: (1) Dies; (2) Marries; (3) Enters active duty in the military; (4) Becomes self-supporting, provided that the custodial parent has relinquished the child from parental control by express or implied consent; or (5) Reaches age eighteen, unless . . . . [s]he is enrolled

18

in and attending a secondary school program of instruction, the parental support obligation shall continue until the child completes such program or reaches age twenty-one, whichever first occurs. [6] If the child is enrolled in an institution of vocational or higher education not later than October first following graduation from a secondary school and so long as the child continues to attend such institution of vocational or higher education, the parental support obligation shall continue until the child completes h[er] education, or until the child reaches the age of twenty-two, whichever first occurs.

The only difference between the language in the agreement and the statute is that the agreement distinguishes the condition of becoming "self-supporting" from the condition of "emancipation," while the statute includes "emancipation," i.e., "the custodial parent has relinquished the child from parental control by express or implied consent," in the definition of "self-supporting." *Cf. Black's Law Dictionary* 598 (9th ed. 2009) (defining "emancipation" as "surrender and renunciation of the correlative rights and duties concerning the care, custody, and earnings of a child"). This minor difference has no bearing on the age at which support terminates for a child attending college.[10]

Rather, as is pertinent here, the provision of the 1992 agreement setting the age at which support terminates for a child attending college, i.e., twenty-two years old, is consistent with the minimum age required by the then-in-effect version of section 452.240.5, which was also twenty-two. Because Father assented to pay support for no longer than required by the law at the time of the 1992 agreement, he is not obligated to

---

[10] If anything, the agreement apparently contemplates a lesser obligation than the statute. The statute allows child support to terminate only if a child is "self-supporting" *and* "emancipated." *See* § 452.340, R.S.Mo. (Cum. Supp. 1990) ("[T]he obligation of a parent to make child support payments shall terminate when the child . . . [b]ecomes self-supporting, *provided that the custodial parent has relinquished the child from parental control by express or implied consent* . . . ." (emphasis added)). In other words, both conditions are rolled into a single event that will trigger termination. The agreement, on the other hand, lists becoming "emancipated" and becoming "self-supporting" as separate events, each sufficient in its own right to trigger termination.

pay support for longer than required by the present law, "even though the [agreement] was entered prior to the effective date of the statute lowering the age of majority." *Kocherov*, 775 S.W.2d at 542-43. Presently, the law sets the age for termination of support for a child attending college at twenty-one. § 452.340.5, R.S.Mo. (Cum. Supp. 2008). Thus, the trial court erroneously applied the law when it ordered Father to pay child support beyond Child's twenty-first birthday. We reverse the trial court's judgment as to the date of termination of Father's support obligation.

### 6. Out-of-State College Tuition

In his sixth point, Father argues that the trial court erred by ordering him to pay 100% of Child's out-of-state college tuition at the University of Kansas-Lawrence, as well as room, board, meals, travel, and study abroad. Specifically, Father argues that the trial court failed to consider both his ability and willingness to pay for these expenses, which amount to over $100,000.[11] Mother responds that the trial court was not required to apply any cost-benefit analysis to Child's choice of an out-of-state school, and was in the best position to determine whether Father can afford Child's college expenses.

"The trial court is best situated to determine a child's need for help with college expenses and assess the ability of the non-custodial parent to help pay those expenses." *Forde*, 190 S.W.3d at 527. "Missouri courts have deferred to the judgment of the

---

[11] The trial court ordered Father to pay $82,183 for Child's college expenses submitted by the date of trial. This award included $6,279 for Child's room and board during the 2012-2013 school year, but did not include that year's tuition. The record shows that out-of-state tuition and fees at the University of Kansas-Lawrence are approximately $26,000 per year, based on Child's fall 2011 bill. Therefore, the trial court's judgment made Father responsible for approximately $108,000 in total post-secondary expenses before Child's emancipation in the summer of 2013. We do note, however, that the trial court erroneously determined that child support would terminate in the summer of 2013, when Child reached twenty-two years of age. As we have explained, Father's obligation actually terminated when Child reached twenty-one.

custodial parent with respect to decisions concerning education beyond that provided by the state system." *Leahy v. Leahy*, 858 S.W.2d 221, 226 (Mo. banc 1993). There is no requirement the court weigh the benefit a child will receive by attending a particular college against the relative price of that college compared to other institutions which the child might attend. *Id.*

But the trial court "is required to consider the amount and reasonableness" of a child's education expenses in light of the financial wherewithal of both parents, "and to order the party paying child support to pay the portion of those expenses which is reasonable and appropriate." *Shiflett v. Shiflett*, 954 S.W.2d 489, 494 (Mo. App. W.D. 1997). Further, in each case where the non-custodial parent is ordered to pay for a child's educational expenses, the trial court must consider:

> (1) the financial ability of the non-custodial parent; (2) the ability and capacity of the child for college work; (3) the nearness of the child to the age of majority; (4) whether the child is self-supporting; [and] (5) the non-custodial parent's willingness to provide for such education, as shown by some agreement or other indication on his or her part.

*Forde*, 190 S.W.3d at 528; *see also Shiflett*, 954 S.W.2d at 494.

Here, again, the trial court failed to consider Father's financial ability when ordering him to pay over $100,000 for Child's college expenses. As we have explained, the trial court's imputation of salary, capital gains, and inheritance income was erroneous. Thus, the trial court's assessment of Father's income does not support the conclusion that Father has the ability to afford the trial court's award of college expenses.[12] Likewise, the trial court could not have ordered Father "to pay the portion of

---

[12] Though we need not reach whether the trial court considered Father's "willingness to provide for [Child's] education, as shown by some agreement or other indication on his or her part," *Forde*, 190 S.W.3d at 528, we do note that the trial court's

21

those expenses which is reasonable and appropriate," *Shiflett*, 954 S.W.2d at 494, because it used an erroneous assessment of Father's income when comparing the parents' relative resources and dividing responsibility for Child's college expenses accordingly.

Moreover, the record contains no other findings of fact that support the conclusion that Father has the ability to pay. Father's average gross income between 2003 and 2010 was $62,000. Thus, the trial court's award of over $100,000 in college expenses represents nearly two years of Father's average pre-tax income.

Again, given the trial court's unsubstantiated imputation of income to Father, and given the lack of any other evidence that Father can afford the trial court's award, the court's award of college expenses is unsupported by substantial evidence of Father's ability to pay. Accordingly, we reverse the trial court's award of child support and expenses.

**7. Matters Not Properly Pled or Tried by Consent**

In his seventh point, Father argues that the trial court erred by hearing evidence on the issues of Child's college expenses and the date Father's support obligation terminates, because those issues were not properly pled or tried by consent. Specifically, Father contends that the court should not have permitted the pleadings to be amended to conform to this evidence, because "the presentation of the merits of the underlying action was not served thereby." Rule 55.33(b). Mother denies that these issues were outside the scope of the pleadings, and contends that even if they were they caused no "prejudice in maintaining the action or defense upon the merits." Rule 55.33(b).

---

judgment failed to mention the 1992 agreement's language regarding college expenses, which stated that the parties "will share equally the costs of college education." We also observe that the trial court found the agreement's terms dispositive on the separate issue of Father's intent to pay support until Child reached twenty-two years of age.

Rule 55.33(b) provides:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would cause prejudice in maintaining the action or defense upon the merits.

"Prejudice suffered by the non-moving party is measured by whether a party is deprived of a legitimate claim or defense because the motion for leave to amend caught that party by surprise after it had developed its strategy." *Wheeler*, 335 S.W.3d at 511. "The real test is whether additional proof or additional witnesses for which a party is not prepared would be required to meet the new allegations." *Id.* (quoting *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 114 (Mo. App. W.D. 2006)).

Here, we need not address the issue of the trial court's consideration of the actual age at which child support terminates, because we have already resolved that issue on other grounds. Moreover, we need not address whether the objected-to evidence was within the issues pled by Mother, or whether its admission aided presentation of the merits of the action, because Father's brief is devoid of any argument regarding prejudice to him in maintaining the action or defense upon the merits. He does not contend that he was deprived of a legitimate claim or defense, or that he was not prepared with additional proof or witnesses to counter the complained of evidence. Instead, Father merely argues that the evidence was unnecessary "in order to hear the relevant issues of modification of support." Accordingly, pursuant to Rule 55.33(b), we affirm the trial court's decision to hear evidence on the issues of Child's college expenses and the date Father's support obligation terminates.

## 8. Attorney's Fees

In his eighth point, Father argues that the trial court erred by ordering him to pay 100% of Mother's attorneys fees, which total $165,982. The trial court ordered Father to pay these fees, because it found that he prolonged the litigation and was better able to afford them. Father contends that Mother was at fault for several of the delays in the litigation, that Mother is in a better financial position to afford her own fees, and that the amount of Mother's fees is patently unreasonable. Mother responds that the trial court's award of attorney's fees was justified in particular because of Father's misconduct in underreporting income and dilatory tactics at trial.

"As a general rule, parties to a dissolution action pay their own attorney's fees." *Hern v. Hern*, 173 S.W.3d 653,656 (Mo. App. E.D. 2005). Pursuant to section 452.355.1, R.S.Mo. (2000), however, "the court . . . after considering all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action, may order a party to pay a reasonable amount for the cost to the other party . . . for attorney's fees." *See also Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 399 (Mo. banc 2001). "[A] showing of unusual circumstances justifying deviation from the normal rule that each party should bear his own litigation costs" must be made before the court will award attorney's fees." *Pecher v. Pecher*, 398 S.W.3d 580, 586 (Mo. App. W.D. 2013) (alteration in original) (quoting *Reiter v. Reiter*, 372 S.W.3d 899, 905 (Mo. App. W.D. 2012)). "[W]here misconduct has taken place, a trial court may grant a partial award of attorney fees, even where the parties' financial condition does not otherwise necessitate an award of fees." *Engeman v. Engeman*, 123 S.W.3d 227, 240 (Mo. App. W.D. 2003). But "in the absence of evidence as to the parties' financial

resources, an award of attorney fees cannot be supported." *Gentry v. Simmons*, 754 S.W.2d 579, 584 (Mo. App. W.D. 1988); *In re Marriage of Trimble*, 978 S.W.2d 55, 59 (Mo. App. S.D. 1998).

Here, as previously explained, the trial court's award is unsupported by evidence of Father's ability to pay. The trial court's imputed figures for Father's salary, capital gains, and inheritance income were all erroneous. Such erroneous figures do not substantiate Father's ability to afford Mother's fees. Likewise, the trial court record contains no other evidence that Father has the ability to pay. The trial court's $165,000 award dwarfs Father's reported gross income, which averaged approximately $62,000 per year between 2003 and 2010. If we consider Father's own attorney's fees of approximately $60,000 together with the trial court's award, Father's total legal bill would be $225,000, or more than three and a half years of his average pre-tax income.

Without a substantiated assessment of Father's income, or any other evidence that Father can afford the trial court's considerable award, the trial court's award of attorney's fees "cannot be supported." *See Geary v. Geary*, 697 S.W.2d 318, 321 (Mo. App. E.D. 1985) (evidence of parties' financial resources insufficient to sustain award of attorney's fees, where trial court "knew only that father was a sales manager for an insurance company and leased a home in an upper middle class neighborhood, and that mother worked as a sales representative). Accordingly, we reverse the trial court's award of attorney's fees to Mother.

### 9. Motion for Change of Judge

In his final point, Father argues that Judge Burton erred by denying his motion to disqualify Judge Hood for prejudice. Specifically, Father argues that Judge Hood was

hostile to him throughout the proceedings, for example, by stating that Father "dodged a bullet" by settling a contempt motion before the court could rule on it. Mother responds that Father failed to demonstrate prejudice, because he offered no evidence that Judge Hood rendered his opinion on the merits on some basis other than what he learned at trial.

"In reviewing the trial court's denial of a motion for change of judge, the appellate court presumes that a trial judge will not preside over a proceeding in which the judge cannot be impartial." *Elnicki v. Caracci*, 255 S.W.3d 44, 48 (Mo. App. E.D. 2008). But "[t]he law is very jealous of the notion that a judge should be impartial." *Id.* at 49. "It is vital to public confidence in the legal system that decisions of the court are not only fair, but also appear fair." *State ex rel. Wesolich v. Goeke*, 794 S.W.2d 692, 695 (Mo. App. E.D. 1990).

Section 508.090.1, R.S.Mo. (2000), provides that a judge may be disqualified in a civil suit for the following causes: "(1) That the judge is interested or prejudiced, or is related to either party, or has been of counsel in the cause; [or] (2) That the opposite party has an undue influence over the mind of the judge." "It is not every prejudice, however, that rises to a level that is legally sufficient to disqualify a judge from the duty of hearing a case." *Elnicki*, 255 S.W.3d at 49. Instead, legally sufficient

> [p]rejudice is the attitude of personal enmity toward the *party* or in favor of the adverse party to the other's detriment. It is not the mere possession of views regarding the law or the conduct of a party or of his counsel. Prejudice is in the personal sense rather than in the judicial sense. Prejudice refers to a mental attitude or a disposition of the judge towards a party: either a hostile feeling or spirit of ill-will against one of the litigants, or a favoritism towards one of them. Bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. An impersonal prejudice resulting from background experience is insufficient.

*Id.* at 49-50 (quoting *Goeke*, 794 S.W.2d at 697).

Additionally, "[a] judge's comments alone, "even those that are critical or even hostile to a party, do not support a claim of bias and partiality." *Williams v. Reed*, 6 S.W.3d 916, 923 (Mo. App. W.D. 1999) (quoting *Haynes v. State*, 937 S.W.2d 199, 204 (Mo. banc 1996)). "Rather, the judge's comments must be reviewed 'in the context of all statements of the judge and of the circumstances before the trial judge when the statements were made' to determine whether the negative comments created an appearance of impropriety which would cause a reasonable person to doubt the judge's impartiality." *Id.* (quoting *Haynes*, 937 S.W.2d at 204).

Judge Burton is correct that Judge Hood's actions did not rise to the level of disqualifying prejudice. First, Judge Burton did not find credible Father's testimony that Judge Hood stated Father "dodged a bullet" by settling a motion for contempt. *See Forde*, 190 S.W.3d at 527 ("We . . . defer to the trial court's superior ability to determine the credibility of witnesses."). Second, even had Judge Hood stated that Father "dodged a bullet," hostile comments alone do not support a claim of bias or partiality. *Williams*, 6 S.W.3d at 923. Judge Burton found that Judge Hood was frustrated with the repeated failures of both parties to follow his instructions regarding discovery and retaining representation by counsel. In particular, Judge Hood was frustrated with Father's failure to comply with previous court orders to reimburse Mother for Child's medical expenses. Mother's motion for contempt concerned these medical expenses, and the parties' settlement of the motion ultimately required Father to pay a significant amount of them. In this context, Judge Hood's alleged comment might have been intemperate or inappropriate, but was not so plainly prejudiced as to rise to the level of an abuse of

27

discretion in failing to disqualify Judge Hood.[13] Accordingly, we affirm Judge Burton's denial of Father's motion for change of judge.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's decision to hear evidence on the issues of Child's college expenses and the date Father's support obligation terminates. We also affirm the denial of Father's motion to disqualify the trial judge for prejudice. We reverse the remainder of the trial court's judgment: (1) imputing salary income to Father; (2) imputing capital gains to Father; (3) imputing yearly inheritance income to Father; (4) determining the amount of child support and other expenses; (5) ordering Father to pay support until Child is twenty-two years old; and (6) ordering Father to pay Mother's attorney's fees of over $165,000. We remand for further proceedings consistent with this opinion.

_Lisa S. Van Amburg_

Lisa S. Van Amburg, Presiding Judge

Patricia L. Cohen.J., and
Philip M. Hess, J., concur.

---

[13] Father also contends that Judge Hood was improperly influenced by the events of the previous trial in this matter. Though the actions of the trial court after Judge Hood's denial of Father's motion to modify in the previous action were declared a "nullity" on appeal, *Elnicki*, 255 S.W.3d at 50, "[o]pinions formed by the judge on the basis of facts introduced or events occurring during prior proceedings do not constitute a basis for a bias or partiality motion, unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re C.H.*, 412 S.W.3d 375, 388 (Mo. App. E.D. 2013).