

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **JENNIFER J. McKENNA,** | ) | |
| | ) | |
| **Respondent,** | ) | |
| | ) | **WD87213** |
| **v.** | ) | |
| | ) | **OPINION FILED:** |
| | ) | **June 24, 2025** |
| **STEVEN E. McKENNA,** | ) | |
| | ) | |
| **Appellant.** | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Marty W. Seaton, Judge

**Before Division One:** Karen King Mitchell, Presiding Judge,
Lisa White Hardwick, Judge, and Mark D. Pfeiffer, Judge

Mr. Steven McKenna ("Father") appeals the judgment of the Circuit Court of

Jackson County, Missouri ("trial court"), which granted Ms. Jennifer McKenna's

("Mother") motion to modify child custody, parenting time, and child support

("modification judgment").  On appeal, Father contests the amount of child support

awarded to Mother, arguing the trial court erroneously imputed his income when

calculating the presumed child support award ("PCSA"), and asserts the trial court

improperly ordered him to pay for the children's parochial high school tuition as an extraordinary education expense. We affirm in part and reverse in part.

**Facts and Procedural History[1]**

Mother and Father's marriage was dissolved on March 27, 2015, by a dissolution judgment that provided for joint custody over their two minor children[2] and split parenting time evenly. The judgment also ordered that "the minor children shall attend school in the [local public school district] . . . *unless otherwise agreed by the parties.*" (Emphasis added.)

On November 4, 2021, Mother filed a motion to modify the 2015 judgment to provide her sole custody and to limit Father's visitation to supervised parenting time. She simultaneously filed a motion for a temporary restraining order against Father, requesting that Father immediately cease to have any unsupervised contact with the children. To support her motions, Mother alleged in a verified petition that Father harmed the children's well-being by: disparaging her to the children, unilaterally removing the children from therapy, threatening to remove the children from their parochial school, threatening to remove the children from various activities, drinking to

---

[1] "We view the evidence in the light most favorable to the trial court's judgment and defer to the trial court's credibility determinations. The trial court is free to believe none, part, or all of the testimony of any witnesses." *Heck v. Heck*, 318 S.W.3d 760, 764 (Mo. App. W.D. 2010) (citations omitted) (citing *Potts v. Potts*, 303 S.W.3d 177, 184 (Mo. App. W.D. 2010)).

[2] Pursuant to the directive of section 509.520.1(5), (7) (Supp. IV 2024), we do not use the names of any witnesses or minors in this opinion, other than parties to the underlying litigation. All other statutory references are to THE REVISED STATUTES OF MISSOURI (2016), as supplemented through May 24, 2024, unless otherwise indicated.

the point of intoxication while parenting the children, and verbally abusing the children. Mother specifically identified four alcohol-related incidents where Father either physically harmed one of the children or placed them in great danger of physical harm. Mother also alleged that the children frequently requested to stay with her during Father's parenting time because they feared him, especially when he consumed alcohol. Father's response denied the allegations and accused Mother of coaching the children to make false allegations or of omitting important context surrounding the events that did occur.

Following Father's responsive pleading, the parties agreed to a temporary stipulated order that significantly reduced Father's parenting time and suspended overnight visitation while still allowing Father's parenting time to be unsupervised. The order also required Father to submit to periodic alcohol testing when the children were in his custody. Finally, the trial court forbade both parties from discussing the litigation with the children and from disparaging each other in front of the children or otherwise attempting to diminish the children's affection for the other parent.

The parties proceeded to a bench trial, which was heard by the trial court on five separate evidentiary hearing dates over the course of nearly one year from October 12, 2022, to October 4, 2023. Two weeks after the October 12 hearing, the trial court issued an order of temporary custody, which ordered that Father's parenting time would be supervised. In its order, the trial court expressly found that Father used inappropriate physical discipline during his parenting time, excessively consumed alcohol at times when caring for the children, discussed the pending litigation with the children in direct

3

violation of the earlier stipulated order, threatened to pull the children out of school and therapy, and verbally abused the children.

Based on the full record at trial, the evidence supported the following additional facts relevant to the issues on this appeal.

Shortly before Mother filed her motion to modify, Father, then aged fifty, notified his supervisor that he was voluntarily separating from employment as a managing engineer at the large engineering and construction firm he was employed by at the end of 2021. In the three years preceding Father's voluntary separation from employment, Father reported on his tax returns that he was paid an average income of $273,758 with a high of $299,194. Father had no future plans for employment at the time of his voluntary separation from employment with his then employer.

At the October 12, 2022 hearing, Father testified that he decided to leave his position because it required him to work up to eighty hours per week and required extensive travel, preventing him from spending his desired amount of time with the children. Father claimed that he would only accept a position that would not require him to travel—though Father admitted that he never actually applied for such a position during the time the motion to modify was litigated. He estimated that, given his education and experience, such a position would pay him $80,000, but he acknowledged that he could earn a considerably higher income if he were to accept an engineering employment position that would require some travel. Father requested the trial court impute his income at $80,000 when calculating child support.

At the same hearing, Mother presented evidence of average earning statistics for engineers in the Kansas City area, but ultimately requested in her Form 14 that the trial court rely upon the three years of income tax return data for Father's employment immediately prior to the filing of the motion to modify—namely, that Father's income be imputed to be the average of those three years of *actual* income data, or $273,758.

During the final day of trial on October 3, 2023, nearly two years after Father had left his employment position, Father admitted he had not submitted a single job application to *any* prospective employers and that he had declined to proceed with multiple job offers and interview opportunities from various job recruiters because they all required travel that would prevent him from spending more time with the children— even though Father's parenting time had been significantly reduced since the start of the proceedings. When cross-examined on how he had been spending his days since voluntarily leaving his employment, Father testified that he had been litigating the custody case and improving his personal well-being but made no mention of proactive efforts to seek employment to provide support for his children.

In its modification judgment, the trial court noted the suspicious nature of Father deciding to quit his job "around the same time that [Mother] filed her Motion to Modify" and that "[Father] did not provide credible evidence justifying the voluntary and drastic change in his employment status and income." The trial court further found that Father remained voluntarily unemployed at the time of the judgment despite: having "a positive reputation among his professional peers . . . and recommendations for his work in his field of expertise"; having been "gainfully employed for more than three decades";

5

having sufficient "qualifications, expertise, and education to find employment in his field"; and having "no significant barriers to employment."

Based on these findings and its conclusion that Father's allotted parenting time could accommodate significant work-related travel time—rejecting Father's assertions to the contrary—the trial court accepted Mother's Form 14 and imputed Father's income at $273,758 when calculating child support and determined the PCSA to be $3,175 per month. The trial court declined to rebut the imputed income from Mother's Form 14 as unreasonable or unjust and ordered Father to begin paying that monthly amount.

Beyond the proper child support award, the parties also disputed where the children should attend school. Both parties testified that since the time of the original dissolution judgment, they had jointly agreed to send the children to a kindergarten-through-eighth-grade parochial elementary school. Neither party sought to modify this arrangement and agreed that both children should finish eighth grade at the parochial elementary school. However, the parties disputed whether they agreed to continue sending the children to parochial school through high school.

Father claimed that the parties had never agreed to send the children to a parochial high school. He contended that the children should finish eighth grade and then attend the available public high school because the public school education was adequate.

Mother claimed the parties had always intended and agreed to send their children to a parochial school through the end of high school. She testified that she strongly supported the children continuing their parochial education because they had intertwined their identities with their faith, were involved in several extracurricular activities,

6

attended religious service during the school day, had a community of familiar teachers and friends, and excelled academically in the parochial school system. Mother did not testify or present any evidence regarding the quality of either the public high school or the parochial high school. In fact, Mother testified that the children had not yet selected which parochial high school they wanted to attend.

In its modification judgment, the trial court found that the parties had only agreed to send the children to parochial school until the completion of eighth-grade education. Nonetheless, the trial court's judgment ordered the parties to allow the children to attend parochial school based on the following findings:

> The evidence presented demonstrates that the minor children are highly involved in their . . . faith and in school and [religious community]. The sense of community the children have developed will assist in developing their emotional maturity and provide much needed stability and consistency. The evidence demonstrates attending [parochial] school is a part of the minor children's identity an[d] provides them with an opportunity to grow in their faith, contribute to their community and meet their education goals.

The trial court's modification judgment further ordered Father to pay for half of the children's tuition as an extraordinary child-rearing expense.

As a final matter relevant to this appeal, the trial court's modification judgment awarded Mother sole custody of the children and limited Father's parenting time to a maximum of eight hours' supervised visitation at his home on every other Sunday. The trial court forbade Father from having any unsupervised in-person contact with the children and limited his remote contact with the children to a maximum of three monitored phone calls per week.

7

Father appealed the trial court's modification judgment, but only as to the financial portions of the modification judgment relating to child support and extraordinary expenses relating to high school parochial education for the children. Father does not challenge the portions of the trial court's modification judgment that provide Mother sole physical custody of the children and limit Father's parenting time to eight hours of supervised visitation once every two weeks due, in large part, to Father's narcissistic personality disorder and alcohol abuse problems.

**Father's Deficient Statement of Facts**

Before turning to the merits of Father's appeal, we must address his failure to supply a complete, fair statement of facts. Rule 84.04(c) requires that the statement of facts in the appellant's brief "shall be a fair and concise statement of the facts relevant to the question." Rule 84.03(c).[3] "To present a fair statement of facts, an appellant is required to provide a statement of the evidence in the light most favorable to the verdict, not simply recount [appellant's] version of the events." *Lavery v. Lavery*, 699 S.W.3d 575, 578 (Mo. App. W.D. 2024) (cleaned up) (quoting *Waller v. A.C. Cleaners Mgmt., Inc.*, 371 S.W.3d 6, 10 (Mo. App. E.D. 1999)).

By choosing to omit considerable evidence favorable to the modification judgment which Father unilaterally deemed irrelevant to the issues on appeal, Father has only recounted *his* version of the evidence, violating Rule 84.04(c):

> Aside from violating Rule 84.04(c), failure to acknowledge adverse
> evidence is simply not good appellate advocacy. Indeed, it is often viewed
> as an admission that if the Court was familiar with all of the facts, the

---

[3] All rule references are to I MISSOURI COURT RULES – STATE 2025.

appellant would surely lose.  The function of the appellant's brief is to explain to the Court why, despite the evidence seemingly favorable to the respondent, the law requires that appellant must prevail.

*Prather v. City of Carl Junction*, 345 S.W.3d 261, 263 (Mo. App. S.D. 2011) (citations and quotation marks omitted) (quoting *Evans v. Groves Iron Works*, 982 S.W.2d 760, 762 (Mo. App. E.D. 1998)).

Principally, Father omits any discussion of the testimony of six counselors, therapists, and social workers—even after acknowledging that this evidence took up considerable portions of the trial.  These professionals collectively testified that:  Father is diagnosed with Narcissistic Personality Disorder; he has not taken adequate steps towards seeking mental health treatment; his self-centered approach to parenting prevents him from placing the children's best interests before his own; he refuses to recognize his own shortcomings or the problems he creates; he manipulates the children and places them in the middle of arguments between himself and Mother; he has actively thwarted co-parenting counseling during the proceedings; and Father's relationship with his minor son is so damaged that his son does not feel safe visiting Father without supervision.

Father's statement of facts also omits that the trial court held Father in contempt for violating its temporary custody order by unilaterally withdrawing from co-parenting counseling and using the sessions he did attend to disparage Mother; pervasively using abusive language against Mother in court-monitored communications; speaking inappropriately to the children about the litigation and asking them to comment on the proceedings and the costs of the litigation; and attempting to make unsupervised contact with the children.  The trial court further found that Father violated its order to seek

mental health treatment, which it gave great weight in determining that Father had failed to take the steps necessary to reinstate unsupervised visitation.

Father cannot feign ignorance or surprise that these witnesses and findings of contempt played a crucial role in the trial court's determinations on the issues that Father now contests on appeal because the trial court painstakingly documented them in its judgment and emphasized that Father has repeatedly demonstrated an inability to place the children's interests before his own, that he often used the children as tools to further his personal vendetta against Mother, and that his narcissistic desire to financially harm Mother motivated his actions—especially as it related to child support issues.

These omitted facts are favorable to the modification judgment and relevant to Father's first points on appeal.[4]

In Father's first point on appeal, he contends that the trial court lacked evidence to find that he intentionally left his employment to avoid paying child support and asserts that his income should be imputed at a lower amount because he has been unable to find a job that will pay him at his old income level while also fulfilling his purported desire to travel less in order to spend more time with the children. Father's incomplete statement of facts suggests the trial court disregarded *his* testimony and that Mother presented no evidence to demonstrate that he left his employment to avoid paying child support.

---

[4] Though some of these omitted facts are relevant to our analysis of Point II, the most pertinent facts related to Point II are not in dispute between the parties and, thus, any deficiencies in Father's statement of facts does not hinder our analysis of Point II.

Father's decision to voluntarily leave his employment at approximately the same time Mother's motion to modify was filed must be considered in the context of his history of attacking Mother and prioritizing his vindictiveness against her over the well-being of the children. This evidence supports the argument that Father voluntarily left his employment in a narcissistic effort to minimize the amount of Mother's child support to impose power over her—even though the reduction in child support would reduce his children's standard of living. For the same reason, this omitted evidence also addresses why Father has made no serious proactive efforts to secure employment and why he continues to turn down every offer of employment made to him from employment recruiters, despite his prior record of continuous employment.

We would be well within our discretion to dismiss Father's first point on appeal for his deficient statement of facts. *See Lavery*, 699 S.W.3d at 578 ("For her failures to comply with Rule 84.04(c), we would be well within our discretion to dismiss her appeal . . . ." (citing *R.M. v. King*, 671 S.W.3d 394, 398 (Mo. App. W.D. 2023)). "However, because the facts essential to this appeal have been provided in [Mother]'s brief, we will exercise our discretion to review [Father]'s appeal, *ex gratia*." *Id.* (citing *ModivCare Sols., LLC v. Off. of Admin.*, 682 S.W.3d 810, 818 (Mo. App. W.D. 2024) ("Because 'meaningful appellate review is possible' and because respondents have supplemented the facts with their own statements, we have discretion to review the appeal despite any deficiencies in the appellant brief's statement of facts . . . .")).

11

**Standard of Review**

"The standard of review governing modifications of child support is the same as in any other court-tried case. We will affirm the trial court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Sansone v. Fulton*, 679 S.W.3d 9, 13 (Mo. App. W.D. 2023) (citations and quotation marks omitted).

**Point I**

In Point I, Father argues the trial court erred in imputing his income as $273,758 because the record lacked substantial evidence to conclude that Father voluntarily separated from employment to lower his child support obligation or that Father could find new employment that would pay him the imputed amount.

**Analysis**

A not-supported-by-substantial-evidence challenge requires completion of three sequential steps:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,
>
> (3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010). "[A]dherence to this analytical formula is mandatory not just because this Court says so, but because it reflects the underlying criteria necessary for a successful challenge—the absence of any such

12

criteria, even without a court-formulated sequence, dooms an appellant's challenge."

*Nichols v. Belleview R-III Sch. Dist.*, 528 S.W.3d 918, 928 (Mo. App. S.D. 2017).

Father's failure in his statement of facts to recognize and acknowledge the facts supporting the trial court's modification judgment carries over into Father's lack-of-substantial-evidence challenge in Point I.

Father asserts the trial court lacked sufficient evidence to conclude that he left his employment for the purpose of reducing his income in the child support calculation. In making this argument, Father gathers the following evidence from the record: that he claims he did not have notice of Mother's motion to modify before quitting his job, that he has never missed a child support payment in the past, and that *his* testimony demonstrates he had a valid reason for leaving employment—to travel fewer hours and spend more time with his children. Of course, Father ignores that the trial court found all of Father's testimony to lack credibility and to be inconsistent with his narcissism and selfish conduct in relationship to both Mother and his children.

Father fails to mention that the trial court expressly did not credit Father's reason for leaving his employment and omits the considerable evidence unfavorable to Father: that he has not taken meaningful steps towards spending more time with children by addressing his mental health issues; that he continues to remain unemployed despite having all the qualifications necessary to find employment; that he has a history of putting his needs before his children's needs; and that he acts vindictively towards Mother. As discussed in greater detail above, these facts support a finding that Father

13

reduced his income so that he could inflict financial harm on Mother by reducing his child support obligation.

By omitting numerous relevant facts in the evidentiary record favorable to the modification judgment, Father analyzes a record that is fundamentally different from the one that we have reviewed, and as a result, his analysis is unpersuasive. *See Houston*, 317 S.W.3d at 188 (defendants' exclusion of material favorable evidence rendered their "attempted demonstration analytically useless and provide[d] no support for sustaining Defendants' challenge" to the finding that they had exercised undue influence). We will not become his advocate by collecting the omitted evidence and arguing on his behalf that it is insufficient to support the trial court's findings on imputation:

> To support a favorable decision for Defendants on this point would require this Court to devise and articulate its own demonstration of how the omitted favorable evidence, either by itself or considered along with the partial favorable evidence included by Defendants in their argument, is not substantial evidence . . . . Such action on our part would thrust us into becoming an advocate on Defendants' behalf; a role we are prohibited from assuming.

*Id.* at 189 (citing *Boyd v. Boyd*, 134 S.W.3d 820, 824 (Mo. App. W.D. 2004)). Thus, Father's failure to abide by the mandatory *Houston* analytical framework justifies denying Point I. But, as we discuss below, Point I is also without substantive merit.

In determining child support, a trial court must follow the two-step procedure outlined in *Woolridge v. Woolridge*, 915 S.W.2d 372 (Mo. App. W.D. 1996). *Neal v. Neal*, 941 S.W.2d 501, 504 (Mo. banc 1997). "Step one is a mathematical calculation the mandatory use of which insures that the child support guidelines will be considered in every case as mandated in § 452.340.7 and Rule 88.01." *Woolridge*, 915 S.W.2d at 379.

14

In step two, the trial court exercises its discretion in determining whether to rebut the PCSA derived from step one as "unjust or inappropriate, considering all relevant factors." *M.L.R. v. Jones*, 437 S.W.3d 404, 406 (Mo. App. S.D. 2014) (citing *Woolridge*, 915 S.W.2d at 379).

Here, Father limits his challenge to step one of the *Woolridge* procedure, asserting that the trial court lacked sufficient evidence to impute his income at $273,758 annually when calculating the PCSA. "Form 14 considers the respective parents' incomes, and the Directions and Comments provide that a parent's gross income may be based on income imputed to that parent if the parent is unemployed or found to be underemployed." *Harris v. Harris*, 655 S.W.3d 33, 38 (Mo. App. W.D. 2022) (citations omitted) (citing *Heck v. Heck*, 318 S.W.3d 760, 764 (Mo. App. W.D. 2010)).

> The theory behind imputing income to a spouse/parent is directed toward preventing a spouse from escaping responsibilities to the family by deliberately or voluntarily reducing his or her income. Imputation of income is proper where a parent has voluntarily reduced his or her income without justification. The most common scenario for voluntary reduction of income without justification is where a parent deliberately quits work to reduce his or her child support.

*Cross v. Cross*, 318 S.W.3d 187, 192 (Mo. App. W.D. 2010) (internal citations and quotation marks omitted).

However, a trial court's discretion to impute income is not limitless. It must consider the factors listed in Comment H to Line 1 of the Form 14:[5]

---

[5] The trial court's judgment itemized each of these factors and made specific findings regarding the evidence relevant to each factor.

*Imputed Income*: When determining whether to include imputed income and, if so, the amount to include in a parent's "gross income," a court or administrative agency shall consider all relevant factors, including:

(1) The parent's probable earnings *based on the parent's work history during the three years, or such time period as may be appropriate, immediately before the beginning of the proceeding* and during any other relevant time periods; and

(2) The parent's assets, residence, age, and health; and

(3) The parent's occupational qualifications, employment potential, educational attainments, and record of seeking work; and

(4) The parent's criminal record or other employment barriers; and

(5) The available work or employment opportunities in the community and the prevailing earnings level in the local community; and

(6) Whether the parent is custodian of a child whose condition or circumstances make it appropriate that the parent not be required to seek employment outside the home; and

(7) Other relevant background factors in the case.

(Second emphasis added.) Additionally, the trial court's discretion to impute income is further limited by whether the record supports a finding that the party whom income is imputed to has demonstrated a capacity to earn the imputed amount. *See Keck v. Keck*, 820 S.W.2d 727, 729 (Mo. App. W.D. 1991) ("Even though income can be imputed to a father for the children's best interest, such must be in the father's capacity to earn.").[6]

---

[6] Additionally, "[a]n award of child support must be supported by evidence of the paying parent's ability to pay." *Harris v. Harris*, 655 S.W.3d 33, 41 (Mo. App. W.D. 2022). Father does not challenge the trial court's finding that he has the ability to pay the ordered child support amount. Further, we note that the trial court expressly found in the modification judgment that Father is fully capable of working and that he has a net worth in excess of one million dollars, which constitutes sufficient evidence to conclude that Father has the ability to pay the child support award.

In cases where a party's income is imputed, Missouri courts have drawn a distinction based on whether the imputed party's change in employment is involuntary or voluntary.

Where the imputed party's income has been reduced involuntarily and the imputed party has demonstrated that the prior employment is unavailable due to external economic forces, the trial court may not impute the full amount of the party's prior income and must instead impute income based on the imputed party's presently demonstrated earning capacity. *See Buchholz v. Buchholz*, 166 S.W.3d 146, 154-56 (Mo. App. S.D. 2005) (en banc) (refusing to impute the full amount of a store manager's previously earned salary after he lost his job when the store went bankrupt and he later accepted the only job offered); *Silverstein v. Silverstein*, 943 S.W.2d 300, 301-02 (Mo. App. E.D. 1997) (finding no substantial evidence to impute a salary of $48,000 to a former retail manager who was terminated when her employer "down-sized" and who later made significant, unsuccessful efforts to find employment); *Keck*, 820 S.W.2d at 728-29 (declining to impute a pilot's previous higher salary after he lost work due to a labor strike and later accepted the only job offered to him); *Garrison v. Garrison*, 846 S.W.2d 771, 772, 776-77 (Mo. App. S.D. 1993) (finding insufficient evidence to impute the prior salary of the president of a truck stop franchise when he lost his job due to the franchise's bankruptcy and lacked financial resources to start a new business).

In contrast, when a party voluntarily decreases income by ceasing to work or choosing to work a lower-paying position without adequate justification, the trial court may impute the full amount of that party's prior income. *See Harris*, 655 S.W.3d at 37,

39-40 (imputing a monthly income of $8,000, despite an actual monthly income of $3,900, because the party reduced his work hours explicitly because the marriage ended); *Heck*, 318 S.W.3d at 766-67 (imputing a party's income at $100,000 based on his prior income despite his present unemployment and holding that "Mother was not obliged to prove that Father could generate the amount of income imputed to him when Father's conduct and words provided all of the proof the trial court needed that Father was purposefully underemployed"); *Cross*, 318 S.W.3d at 189 (imputing the full amount of the imputed party's higher pre-modification income because the imputed party temporarily stopped working his second job for the purpose of reducing his income).

As discussed above, the trial court found Father did not provide a credible justification for voluntarily leaving his employment or for remaining voluntarily unemployed throughout the modification proceedings. The modification judgment also documents that the timing of Father's sudden exit from employment at or about the same time of Mother's motion to modify was suspicious and consistent with other findings of narcissism and selfish behavior by Father; that Father has not proactively sought employment and has actively turned down employment offers in his field; and that his primary explanation for turning down these offers, to spend more time with his children, is not credible because Father has taken no significant steps towards treating his mental health issues that prevent him from having safe, unsupervised parenting time. Meanwhile, Father's well-established inability to put his children's interests before his own and Father's vindictiveness towards Mother provide reasonable grounds for

18

concluding that Father intentionally quit his job to attempt to ensure that Mother would receive less child support.

Because the evidence in the record was sufficient to find that Father was intentionally unemployed, the trial court appropriately imputed his income based on his three previous tax returns—even though Father no longer earned that level of income. *See Heck*, 318 S.W.3d at 762, 765 (imputing a party's income at $100,000 based on the party's prior two years of tax returns following a finding that the imputed party was intentionally underemployed). Because the trial court had an adequate basis supported by substantial evidence for imputing Father's income, it did not err in accepting Mother's Form 14 calculation using that imputed amount.

Point I is denied.

## Point II

In Point II, Father argues that the trial court erred in ordering him to pay half of the children's tuition for parochial high school as an extraordinary education expense.

As explained by Comment A to Line 6e of the Form 14, a trial court may not ordinarily consider the cost of private school tuition when performing its child support calculation: "[P]rivate or parochial elementary, middle and high school expenses are not included in the schedule of basic child support obligations." But in some cases, the trial court may order a party to pay tuition for a private high school as an extraordinary education expense:

> Costs of private school education may be included as an "other extraordinary child-rearing cost," provided the parents agree or the court orders that the parents contribute to payment of those costs. When a parent

19

does not agree to those expenses, the trial court must determine that private education will meet the particular educational needs of the child.

*Engeman v. Engeman*, 123 S.W.3d 227, 239 (Mo. App. W.D. 2003) (internal citations omitted). Here, Mother testified that the parties had agreed to send the children to parochial school through high school while Father testified that the parties had only agreed to do so through eighth grade. The trial court resolved this conflicting testimony by concluding that the parties' agreement only went through eighth grade. Nonetheless, the trial court ordered the children be allowed to attend parochial high school and ordered Father to pay half of the school's tuition. Because the parties did not have an agreement to send the children to a parochial high school and because Father objected to paying the private school's tuition, the trial court was only authorized to order Father to pay half of the tuition if the evidence demonstrated that the parochial high school would serve a particular educational need of the children.

"The use of the terms 'educational needs' implies something more than a preference." *Schmidt v. Schmidt*, 949 S.W.2d 117, 121 (Mo. App. E.D. 1997). Missouri courts consider a party's desire for religious instruction merely a preference and not an educational need. *See Drury v. Racer*, 17 S.W.3d 608, 611 (Mo. App. E.D. 2000) ("In this case, however, mother testified to no particular aspect of the curriculum at the parochial school, other than the religious instruction, that prompted her desire that the child attend the private school. More importantly, mother stated the local public school was in no way academically inferior to the parochial school."); *Seyler v. Seyler*, 201 S.W.3d 57, 65 (Mo. App. E.D. 2006) (holding that husband failed to demonstrate that the

child's attendance at a Catholic school would meet a particular educational need, even though husband testified he wanted his child to continue a Catholic education and even though the guardian ad litem testified that moving to a public school would not be in the child's best interest).

The record here is nearly identical to the facts of *Seyler*. There, the parties' minor child had attended the same parochial school since preschool and was in seventh grade at the time of trial. *Seyler*, 201 S.W.3d at 64-65. The parochial school went through eighth grade, and the parties agreed their child should finish eighth grade there. *Id.* at 65. However, the mother wanted to move the child into a public high school after eighth grade while the father wanted the child to attend the high school branch of the parochial school. *Id.* The father testified that he wanted the child to continue receiving religious instruction and that the child had succeeded academically at the parochial elementary school. *Id.* However, father "had no first-hand knowledge or information concerning the high school division of the [parochial school]." *Id.* In its order dissolving the parties' marriage, the lower court held that the parochial school tuition constituted an extraordinary education expense. *Id.* On appeal, the *Seyler* court reversed, reasoning that "[the father] presented no evidence that attendance at the high school division of the [parochial school] met an educational need . . . based on [the child's] attendance at the elementary division. Therefore, the trial court erred . . . in ordering [the mother] to pay fifty percent of the cost to attend the [parochial school]." *Id.*

Just as in *Seyler*, the parties here agreed that the children should finish eighth grade at the parochial elementary and middle school that they have attended since

21

preschool but disagreed on whether the children should attend parochial or public high school. Additionally, Mother's testimony in support of attending the parochial school relies entirely on the parochial school's religious instruction and the children's success in the parochial elementary school, which the *Seyler* court found insufficient to support a finding that the parochial high school would serve an educational need.

Mother attempts to distinguish the present facts from *Seyler* by analogizing them to *McLaughlin v. McLaughlin*, 639 S.W.3d 472 (Mo. App. E.D. 2021). Like the present facts, *McLaughlin* came from the appeal of a motion to modify a prior dissolution judgment rather than an original dissolution judgment. *See id.* at 475. That is where the similarities end. In *McLaughlin*, the original dissolution judgment provided that the children would attend a private elementary school and that each party would pay half of the tuition. *Id.* Therefore, the party that was seeking to avoid paying the *court-ordered* tuition in *McLaughlin* was seeking a *modification of the original dissolution judgment* and, thus, had the burden to establish that the private elementary school served no educational need for the children. *Id.* at 479 ("In a motion to modify seeking to terminate an obligation to pay private school tuition, the particular educational needs of the child must be considered in conjunction with the moving party's burden to prove a substantial and continuing change in circumstances.").

Here, in contrast, the original dissolution judgment provided that the children would attend *public school* unless the parties agreed otherwise. Because the trial court found that the parties did *not* mutually agree to send the children to a parochial high school, Mother's request to have Father pay half of the children's parochial high school

22

tuition would modify the original judgment. Therefore, Mother had the burden to establish that sending the children to a parochial high school would serve a particular educational need. *See Seyler*, 201 S.W.3d at 64 ("[T]o compel a parent to pay for private or parochial schooling for a child, it must be shown that such schooling will meet the particular educational needs of the child.").

Just as in *Seyler*, Mother did not present sufficient evidence to carry this burden. Therefore, the trial court erred in considering the children's parochial high school tuition an extraordinary education expense and in ordering Father to pay half of it.

Point II is granted.

## Conclusion

The portion of the trial court's modification judgment ordering Father to pay half of the children's tuition at a parochial high school is reversed. In all other respects, the modification judgment is affirmed.

_____
Mark D. Pfeiffer, Judge

Karen King Mitchell, Presiding Judge, and Lisa White Hardwick, Judge, concur.

23